PLEASANT GLADE ASSEMBLY OF GOD, Reverend Lloyd A. McCutchen, Rod Linzay, Holly Linzay, Sandra Smith, Becky Bickel, and Paul Patterson, Petitioners,

v.

Laura SCHUBERT, Respondent.

No. 05–0916.

Supreme Court of Texas.

Argued April 12, 2007.

Decided June 27, 2008.

Rehearing Denied Aug. 29, 2008.

David M. Pruessner, Jes Alexander, Law Offices of David M. Pruessner, Craig L. Reese, FLetcher & Springer, LLP, Dallas, TX, for Petitioners.

William O. Wuester, Chandler Grisham, Douglas, Wuester & Stenholm, P.C., Fort Worth, TX, for Respondent.

David M. Colley, Fee, Smith Sharp & Vitullo, Dallas, TX, for Amicus Curiae.

Justice MEDINA delivered the opinion of the Court, in which Justice HECHT, Justice O'NEILL, Justice WAINWRIGHT, Justice BRISTER, and Justice WILLETT joined.

This appeal concerns the tension between a church's right to protection under the Free Exercise Clause of the First Amendment and a church member's right to judicial redress under a claim for intentional tort. U.S. CONST. amend. I; *see also* TEX. CONST. art. I, § 6. The court of appeals generally affirmed the judgment in favor of the church member, concluding, among other things, that the church was judicially estopped to claim First Amendment protection. 174 S.W.3d 388, 405–07. We conclude, however, that the church was not judicially estopped to assert its constitutional rights. We further conclude the case, as tried, presents an ecclesiastical dispute over religious conduct that would unconstitutionally entangle the court in matters of church doctrine and, accordingly, reverse the court of appeals' judgment and dismiss the case.

## I

On Saturday June 8, 1996, Tom and Judy Schubert left town, leaving their three teenage children at home. While the Schuberts were away, their seventeen-year-old daughter, Laura, spent much of her time at the family's church, Pleasant Glade Assembly of God,[1] participating in church-related activities.

On Friday evening, before her parents left town, Laura attended a youth group activity at Pleasant Glade in preparation for a garage sale the next day. The atmosphere during this event became spiritually charged after one of the youth announced he had seen a demon near the sanctuary. The youth minister, Rod Linzay, thereupon called the group together to hear the story, and after hearing it, agreed that demons were indeed present. Linzay instructed the youth to anoint everything in the church with holy oil and led a spirited effort throughout the night to cast out the demons. Finally, on Saturday morning at about 4:30 a.m., Linzay gathered the exhausted youth together to announce that he had seen a cloud of the presence of God fill the church and that God had revealed a vision to him. Although exhausted, the young people assisted with the garage sale later that morning.

At the Sunday morning worship service the next day, several young people gave testimonials about the spiritual events of the preceding day. At the conclusion of the service, the youth, including Laura and her brother, prayed at the altar. During these prayers, Laura's brother became "slain in the spirit,"[2] collapsing to the floor where church members continued to pray into the early afternoon.

Later that afternoon, Laura returned to church for another youth activity and the Sunday evening worship service. During the evening service, Laura collapsed. After her collapse, several church members took Laura to a classroom where they "laid hands" on her and prayed. According to Laura, church members forcibly held her arms crossed over her chest, despite her demands to be freed. According to those present, Laura clenched her fists, gritted her teeth, foamed at the mouth, made guttural noises, cried, yelled, kicked, sweated, and hallucinated. The parties sharply dispute whether these actions were the cause or the result of her physical restraint.

Church members, moreover, disagreed about whether Laura's actions were a ploy for attention or the result of spiritual activity. Laura stated during the episode that Satan or demons were trying to get her. After the episode, Laura also allegedly

---

1. The Assembly of God Church is "[t]he largest denomination to stem from the Pentecostal movement of the early twentieth century ... American Pentecostal leaders agreed to form a simple fellowship of churches within the name 'Assemblies of God' as a scriptural designation ... Assemblies of God describe themselves as 'Pentecostal in experience, evangelical in outlook, and fundamental in their approach to the Bible.'" THE NEW INTERNATIONAL DICTIONARY OF THE CHRISTIAN CHURCH 78–79 (1978). The Church believes in the literal teachings of the Bible with respect to spirits, demons, demon possession, and the "casting out" of demons. WHERE WE STAND: THE OFFICIAL POSITION PAPERS OF THE ASSEMBLIES OF GOD 15–23 (1994).

2. Lloyd McCutchen, Pleasant Glade's senior pastor, explained "slain in the spirit" as:

   [A] biblical experience related in several accounts of the Bible. When this happens, a person often faints into semi-consciousness, and sometimes lies down on the floor of our church. It is our belief that this is a positive experience in which the holy spirit comes over a person and influences them. It is our belief that the holy spirit is not the only spirit that can influence a person. Evil spirits can move and can torment persons.

began telling other church members about a "vision." Yet, her collapse and subsequent reaction to being restrained may also have been the result of fatigue and hypoglycemia. Laura had not eaten anything substantive that day and had missed sleep because of the spiritual activities that weekend. Whatever the cause, Laura was eventually released after she calmed down and complied with requests to say the name "Jesus."

On Monday and Tuesday, Laura continued to participate in church-related activities without any problems, raising money for Vacation Bible School and preparing for youth drama productions. Her parents returned from their trip on Tuesday afternoon.

On Wednesday evening, Laura attended the weekly youth service presided by Rod Linzay. According to Linzay, Laura began to act in a manner similar to the Sunday evening episode. Laura testified that she curled up into a fetal position because she wanted to be left alone. Church members, however, took her unusual posture as a sign of distress. At some point, Laura collapsed and writhed on the floor. Again, there is conflicting evidence about whether Laura's actions were the cause or result of being physically restrained by church members and about the duration and force of the restraint. According to Laura, the youth, under the direction of Linzay and his wife, Holly, held her down. Laura testified, moreover, that she was held in a "spread eagle" position with several youth members holding down her arms and legs. The church's senior pastor, Lloyd McCutchen, was summoned to the youth hall where he played a tape of pacifying music, placed his hand on Laura's forehead, and prayed. During the incident, Laura suffered carpet burns, a scrape on her back, and bruises on her wrists and

shoulders. Laura's parents were subsequently called to the church. After collecting their daughter, the Schuberts took her out for a meal and then home. Laura did not mention her scrapes and bruises to her parents that night.

In July, Laura's father, himself an Assembly of God pastor and missionary, met twice with Senior Pastor McCutchen to discuss the June incidents and the youth ministry. Following those conversations, Senior Pastor McCutchen took the matter to the board of deacons and met with Linzay to discuss theology. Linzay assured McCutchen "that neither he nor Holly believe that Christians can be demon possessed." After meeting with Linzay, McCutchen spent an hour with the youth group to clarify the biblical doctrine of angels, fallen angels, and demonic possession. McCutchen reported his actions to Laura's father in a letter on July 22.

A few days later, Laura's father responded to McCutchen's letter, discussing at length Laura's version of the spiritually charged atmosphere surrounding the weekend of June 7–9 and the following Wednesday evening youth service on June 12. In addition, he stated that Laura "ha[d] started having terrible nightmares" and had felt "that a demon [was] in her room at night." Because missionaries "can not get into local church affairs," Laura's father concluded by asking the senior pastor to investigate the matter further, adding "I am placing this situation in your hands and hope God gives you wisdom." The Schuberts subsequently left Pleasant Glade to attend another church.

Over the next months, several psychologists and psychiatrists examined Laura, documenting her multiple symptoms, such as angry outbursts, weight loss, sleeplessness, nightmares, hallucinations, self-mutilation, fear of abandonment, and agoraphobia. Despite the psychiatric counseling,

Laura became increasingly depressed and suicidal, eventually dropping out of her senior year of high school and abandoning her former plan to attend Bible College and pursue missionary work. Finally, in November 1996, Laura was diagnosed as suffering from—traumatic stress disorder, which the doctors associated with her physical restraint at the church in June 1996. One of the expert witnesses at trial testified that Laura would "require extensive time to recover trust in authorities, spiritual leaders, and her life-long religious faith." Ultimately, Laura was classified as disabled by the Social Security Administration and began drawing a monthly disability check.

Thereafter, Laura and her parents sued Pleasant Glade, the senior pastor, the youth minister, and other members of the church, alleging negligence, gross negligence, professional negligence, intentional infliction of emotional distress, false imprisonment, assault, battery, loss of consortium, and child abuse. The Schuberts further claimed that the defendants' conduct had caused Laura "mental, emotional and psychological injuries including physical pain, mental anguish, fear, humiliation, embarrassment, physical and emotional distress, post-traumatic stress disorder[,] and loss of employment." The Schuberts' petition detailed the June spiritual events at the church leading to Laura's breakdown.

In response, Pleasant Glade and the other defendants sought a protective order and moved to dismiss the Schuberts' lawsuit as an unconstitutional burden on their religious practices, describing the litigation as "a dispute regarding how services should be conducted within a church, including the practice of 'laying on of hands.'" The trial court denied both motions.

In the mandamus proceeding that followed, the court of appeals granted the church's request for relief, agreeing that the Schuberts' "religious" claims were barred by the First Amendment because they "involve[d] a searching inquiry into Assembly of God beliefs and the validity of such beliefs." *In re Pleasant Glade Assembly of God*, 991 S.W.2d 85, 89 (Tex. App.–Fort Worth 1998, orig. proceeding). The court defined "religious" claims to include the Schuberts' claims of negligence, gross negligence, professional negligence, intentional infliction of emotional distress, child abuse, and loss of Laura's consortium. *Id.* at 90. The church did not ask for mandamus protection from Laura's claims of false imprisonment and assault, and those claims were not included in the court's definition of religious claims. *Id.* at 88 n. 3.

Following the mandamus proceeding, the trial court signed a protective order, prohibiting the Schuberts from inquiring into or debating the religious teachings, practices, or beliefs of the Pentecostal or Assembly of God churches. Laura's remaining claims proceeded to trial, where a jury found that Laura had been assaulted and falsely imprisoned by the senior pastor, the youth minister, and several church members. The jury apportioned liability among these defendants, attributing fifty percent to the senior pastor, twenty-five percent to the youth minister, and the remainder to the other defendants. Finally, the jury awarded Laura damages of $300,000 for her pain and suffering, loss of earning capacity, and medical expenses. Following the verdict, Laura moved for judgment, and Pleasant Glade moved for judgment notwithstanding the verdict, asserting once again its free exercise rights under the state and federal constitutions. The trial court rendered judgment on the jury's verdict of false imprisonment, awarding Laura the damages found by the

jury and adding Pleasant Glade as a judgment debtor with joint and several liability for the amounts apportioned to its senior pastor and youth minister. Pleasant Glade and the other defendants appealed.

The court of appeals eliminated the damages awarded for lost earning capacity, concluding that these damages were too remote and speculative, but otherwise affirmed the trial court's judgment in Laura's favor. 174 S.W.3d at 399, 408. Regarding the First Amendment claim, the court concluded that the church and pastors were judicially estopped to assert their constitutional rights because they had taken a contrary position in the previous mandamus proceeding by allowing Laura's claims of assault, battery, and false imprisonment "to go forward." *Id.* at 407.

## II

The doctrine of judicial estoppel "precludes a party from adopting a position inconsistent with one that it maintained successfully in an earlier proceeding." 2 ROY W. MCDONALD & ELAINE G. CARLSON, TEXAS CIVIL PRACTICE § 9.51 at 576 (2d ed.2003). Contradictory positions taken in the same proceeding may raise issues of judicial admission but do not invoke the doctrine of judicial estoppel. *See Galley v. Apollo Associated Servs., Ltd.,* 177 S.W.3d 523, 529 (Tex.App.–Houston [1st Dist.] 2005, no pet.) ("Judicial estoppel does not apply to contradictory positions taken in the same proceeding"). The doctrine is not strictly speaking estoppel, but rather is a rule of procedure based on justice and sound public policy. *Long v. Knox,* 155 Tex. 581, 291 S.W.2d 292, 295 (1956). Its essential function "is to prevent the use of intentional self-contradiction as a means of obtaining unfair advantage." *Andrews v. Diamond, Rash, Leslie & Smith,* 959 S.W.2d 646, 650 (Tex.

App.–El Paso 1997, writ denied); *Hall v. GE Plastic Pac. PTE Ltd.,* 327 F.3d 391, 396 (5th Cir.2003) (noting basis for estoppel is the assertion of a position clearly inconsistent with a previous position accepted by the court); *Tenneco Chem. v. William T. Burnett & Co.,* 691 F.2d 658, 665 (4th Cir.1982) (finding "the determinative factor is whether the appellant intentionally misled the court to gain an unfair advantage").

The doctrine does not apply to the church's free exercise claim here for at least three reasons: (1) the asserted inconsistency did not arise in a prior proceeding, but in this same case; (2) the church did not gain any advantage from the asserted inconsistency; and, most importantly, (3) the church has consistently asserted its First Amendment rights throughout this case, including the mandamus proceeding in which it sought relief from certain tort claims implicating church beliefs and practices. *See In re Pleasant Glade Assembly of God,* 991 S.W.2d at 89.

In that proceeding, the court of appeals agreed with the church that the Schuberts' claims of negligence, professional negligence, intentional infliction of emotional distress, and child abuse involved "not only the appropriateness of attempting to cast demons out of Laura" but also how the pastors' "prayers and comments about demons from June 7 to June 12 affected Laura." *Id.* Whether the defendants had intentionally or negligently misapplied church doctrine to Laura during these events was not a justiciable controversy, according to the court, because the "First Amendment [gave] Pleasant Glade the right to engage in driving out demons." *Id.* Pleasant Glade, however, did not seek mandamus relief for Laura's "pure bodily injury claims of assault, battery and false imprisonment." It is this omission from Pleasant Glade's mandamus petition that

the court of appeals now views as an estoppel to the church's present First Amendment claim.

Pleasant Glade's petition for writ of mandamus, however, stated in relevant part:

Plaintiff, Laura Schubert, a teenager, does bring a *secular complaint* against the church and its pastors. It begins when, according to her own pleading, she "collapsed" while standing at the altar of the church during a church service. She alleges she was physically grasped, taken and held on the floor of the Church against her will. *This was allegedly done as part of an "exorcism" in an alleged attempt to exorcise a demon from her. However, this religious context is actually irrelevant.* Since Laura Schubert alleges she was held on the floor against her will, she brings claims for assault, battery, and false imprisonment. *This is a "bodily injury" claim ... Relators, the church and the pastors, concede that this is a "secular controversy" and does not come within the protection of the First Amendment. That is, no church or pastor can use the First Amendment as an excuse to cause bodily injury to any person. . . .*

\* \* \*

. . . If this were the sum total of this dispute, Relators would not be here before this Court ... No religious beliefs would be implicated. The First Amendment and the free exercise of religion would simply not be an issue. *Therefore, Relators do not request that this Court issue mandamus to stop litigation of this "secular controversy for bodily injury."*

(emphasis added). From this, it would appear that Pleasant Glade viewed Laura's claims of emotional damages as religious in nature; whereas any claim for physical injury, the church deemed secular. Based on this characterization, Pleasant Glade only sought mandamus relief for Laura's emotional injuries.

The court of appeals, however, observed that "[h]aving obtained, in the prior mandamus proceeding, the dismissal of all but Laura's assault and false imprisonment claims, which they swore under oath should 'go forward' because they were purely secular and entitled to no First Amendment protections, [Pleasant Glade] cannot now 'play fast and loose' with the judicial system by taking the opposite position in this appeal to suit their own purposes." 174 S.W.3d at 407. The court then held the "church and pastors [were] [judicially] estopped from asserting in this appeal that they are entitled to First Amendment protections with regard to Laura's assault and false imprisonment claims." *Id.*

Pleasant Glade's mandamus petition, however, merely distinguished Laura's bodily injury claims from her emotional damage claims. That distinction is consistent with its present appellate contention that the award of damages for Laura's emotional injury is barred by the First Amendment. It is not apparent, therefore, how Pleasant Glade's previous concession that Laura's purely physical injuries were secular, rather than religious in nature, is inconsistent with the church's present position. Pleasant Glade argues on appeal that the First Amendment protects it from liability for Laura's emotional injuries connected with its religious practices, and the court of appeals agreed in its mandamus opinion that the conduct alleged in the Schuberts' petition was "inexorably intertwined with Pleasant Glade's religious beliefs" and thus protected under the First Amendment. *In re Pleasant Glade Assembly of God*, 991 S.W.2d at 90.

Nor is it apparent how Pleasant Glade has obtained an unfair advantage by omitting the assault and false imprisonment claims from its mandamus request. But aside from that, even assuming the church's mandamus and appellate contentions were contradictory, the mandamus proceeding is a part of this case, not some prior proceeding. Judicial estoppel does not apply to contradictory positions taken in the same proceeding. *Galley*, 177 S.W.3d at 529; *see Starcrest Trust v. Berry*, 926 S.W.2d 343, 355 (Tex.App.–Austin 1996, no writ); *Estate of Devitt*, 758 S.W.2d 601, 603 (Tex.App.–Amarillo 1988, writ denied).

In conclusion, it is not apparent why Pleasant Glade's failure to ask for additional mandamus relief should foreclose its present request for appellate review. Certainly, the doctrine of judicial estoppel does not require this. Thus, we hold that the church is not estopped to assert its First Amendment defense.

## III

■ Because Pleasant Glade is not judicially estopped, we next consider whether the church's religious practice of "laying hands" is entitled to First Amendment protection. Pleasant Glade contends the First Amendment protects it against claims of intangible harm derived from its religious practice of "laying hands." The church relies on *Paul v. Watchtower Bible & Tract Society of New York, Inc.*, 819 F.2d 875 (9th Cir.1987), for this proposition.

In *Paul*, the Ninth Circuit was asked to determine whether the Jehovah's Witness' practice of shunning was protected by the Free Exercise Clause. 819 F.2d at 878. After being excommunicated from the church, the plaintiff brought suit against the congregation, alleging common law torts of defamation, invasion of privacy, fraud, and outrageous conduct. *Id.* at 877. Because the church's practice of shunning was exclusively based on their interpretation of canonical text, the court found "[t]he harms suffered by Paul as a result of her shunning by the Jehovah's Witnesses are clearly not of the type that would justify the imposition of tort liability for religious conduct." *Id.* at 883. In particular, the Ninth Circuit held that "[i]ntangible or emotional harms cannot ordinarily serve as a basis for maintaining a tort cause of action against a church for its practice—or against its members." *Id.* Therefore, "[a] religious organization has a defense of constitutional privilege to claims that it has caused intangible harms—in most, if not all, circumstances." *Id.*

Laura asserted, however, that the events at the church caused her both physical and emotional injury, and the church concedes that the First Amendment does not protect it from Laura's claim of physical injury. But Laura's case was not about her physical injuries. Although she suffered scrapes and bruises during these events, her proof at trial related solely to her subsequent emotional or psychological injuries. Laura testified about her fear and anxiety during these events, recalling that she had hallucinated, had trouble breathing, feared that her leg might be broken, and feared that she might die. Her memory of the experience also included many details. She could name the people who held her, where they had placed their hands, and even in whose lap her head rested during part of her ordeal. She also remembered being given water to drink, being walked with, and having a cold compress held to her forehead. Her final memory of the Wednesday evening episode was of her parents coming to take her home and walking with her father in the sanctuary. She could not recall events after that, including her family's stop at a

restaurant for dinner on the way home. Laura did not assert that the church-related events had caused her any physical impairment or disfigurement. She did not complain of physical injury that night, and her scrapes and bruises went unnoticed until the next morning when she showed them to her parents. Her medical proof at trial was also not about physical injury but about her psychological evaluations and treatment. Under this record, any claim of physical pain appears inseparable from that of her emotional injuries.

Indeed, her case at trial was not significantly different from what she would have presented under her claim of intentional infliction of emotional distress, a claim the court of appeals agreed should be dismissed. *In re Pleasant Glade Assembly of God*, 991 S.W.2d at 90. We have previously said that adjudication of this type of claim "would necessarily require an inquiry into the truth or falsity of religious beliefs that is forbidden by the Constitution." *Tilton v. Marshall*, 925 S.W.2d 672, 682 (Tex.1996). This type of intangible, psychological injury, without more, cannot ordinarily serve as a basis for a tort claim against a church or its members for its religious practices. *See Cantwell v. Connecticut*, 310 U.S. 296, 310, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) (holding that the intangible harms caused by playing religious records to the public is insufficient to impose civil or criminal liability); *see also Murphy v. I.S.K. Con. of New Eng., Inc.*, 409 Mass. 842, 571 N.E.2d 340, 348 (1991) (holding that the intangible harms caused by using "offensive" religious scriptures is not actionable).

CHIEF JUSTICE JEFFERSON's dissent asserts, however, that a court should use an instruction to separate the "damages only for the mental anguish the plaintiff would have suffered had the tort been committed by a secular actor in a secular setting." 264 S.W.3d at 21 (Jefferson, C.J., dissenting). However, even Laura's psychological expert, Dr. Arthur Swen Helge, admitted that he could not separate the damages resulting from Laura's physical restraint and the psychological trauma resulting from the discussion of demons at the church.[3] Because of Dr. Helge's inability

---

**3.** Before Dr. Helge was permitted to testify, he was questioned about the basis of his opinion:

Q. Okay. In the—the course of gathering this information from Laura, did she tell you about chasing demons, being told about demons, being terrified about demons?

A. Yes.

Q. And was that in the medical records that you wrote down, the statements about demons?

A. . . . I'm certain there's probably some reference to demons in there.

Q. And in the medical records you read, you saw those, too, references to demons and the spiritual activities that were going on at the church?

A. Yes.

Q. Okay. Do you believe that those traumatized Laura?

A. I believe that experience traumatized her.

Q. Okay. So, this—when you say Laura has been traumatized, you're talking about, in part, the experience about being told about demons, demons in her presence, demons around her, they need to get rid of demons, chase them away, beat on the walls of the church, anoint things with oil, that whole Friday night length of activity, you believe that's part of Laura Schubert being traumatized?

A. Yes, I do.

Q. Okay. Have you been asked to separate out—in order to render your opinion today, have you been asked to separate out what type of trauma Laura suffered from being told about demons as opposed to just physical activities, being held down on the floor, that sort of thing? Have you been asked to make that separation?

A. No.

Q. And it would be kind of hard for you to make that separation after having been given all the medical records that have all this spiritual matter in it, and having that all

to separate these damages, the church repeatedly objected that the witness not be allowed to testify.[4] Even if a jury could parse the emotional damages attributable solely to secular activity, which is doubtful, in *Westbrook v. Penley*, we emphasized that even though the elements of a common law tort may be *defined* by secular principles without regard to religion, it does not necessarily follow that *application* of those principles to impose civil tort liability would not run afoul of protections the constitution affords to a church's right to construe and administer church doctrine. 231 S.W.3d 389, 400 (Tex.2007). In this case, although Laura's secular injury claims might theoretically be tried without mentioning religion, the imposition of tort liability for engaging in religious activity to which the church members adhere would have an unconstitutional "chilling effect" by compelling the church to abandon core principles of its religious beliefs. *See id.* at 397 ("While it might be theoretically true that a court could decide whether Westbrook breached a secular duty of confidentiality without having to resolve a theological question, that doesn't answer whether its doing so would unconstitutionally impede the church's authority to manage its own affairs."); *see also Paul,* 819 F.2d at 881 (noting that "[i]mposing tort liability for shunning on the Church would in the long run have the same effect as

prohibiting the practice and would compel the Church to abandon part of its religious teachings").

According to Pentecostal religious doctrine, whenever a person is believed to be under "spiritual influence," the church "lays hands" on the person and anoints oil to combat "evil forces." *See supra* note 2. Senior Pastor McCutchen, in an affidavit supporting the church's motion for summary judgment, explained the practice:

> ... Many people did "lay hands" on Laura Schubert and pray [sic] for her, according to the custom of our church. This type of activity happens on a very regular basis in our church, since we believe in the physical conduct of laying hands on persons in order to pray for them.
>
> [ ] Within our church, it is not unusual for a person to be "slain in the spirit." This is a biblical experience, related in several accounts of the Bible. When this happens, a person often faints into semi-consciousness, and sometimes lies down on the floor of our church. It is our belief that this is a positive experience in which the holy spirit comes over a person and influences them. It is our belief that the holy spirit is not the only spirit that can influence a person. Evil spirits can move and can torment per-

---

entered into your mind? ... That would be hard—pretty hard to do, wouldn't it?

A. Yes.

4. The church objected:

Q. Your Honor, ... at this point, we would ask that Your Honor sustain our objection and exclude this witness from testifying about any trauma that Laura suffered because the witness has indicated that he has included both First Amendment protected activities, and the physical activities, and formed them into one opinion.

Q. Your Honor, ... [w]e'd like to renew our motion to exclude the testimony of Dr. Helge. It's clear that not only has he mixed

in the religious activities and included criticisms of telling Laura what to think, which is almost the definition of religious teaching, is telling a person what to think, and how to think. He has confused that in ... [H]e has impermissibly combined protected religious activities with other activities, and so his opinion in testifying here in court would actually undercut the Court of Appeals opinion, circumvented, and effectively defeated by simply considering a lot of matters outside the courtroom and rendering an opinion about trauma, even if that trauma comes from religious experience.

sons. Also, it is possible that a person (particularly a young dramatic person such as Laura Schubert) can take advantage of the attention that this activity brings. They can fake the entire experience in order to draw attention to themselves.

[ ] When a person comes forward in the service and begins having one of these experiences, it is sometimes difficult to discern whether: (1) the person is having a positive experience with the holy spirit, (2) whether there might be evil spirits engaged in warfare against the holy spirit, (3) whether there are emotional issues are [sic] involved, or (4) whether the person is faking the entire process in order to gain attention. Discerning between these various influences and factors is a matter on which even pastors within the church might disagree....

Clearly, the act of "laying hands" is infused in Pleasant Glade's religious belief system. JUSTICE GREEN maintains in his dissent, however, that we "can and should decide cases like this according to neutral principles of tort law ... [i]f a plaintiff's case can be made without relying on religious doctrine." 264 S.W.3d at 23 (Green, J., dissenting) (citing *Employment Div. Dep't of Human Resources v. Smith,* 494 U.S. 872, 876–90, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)). But, contrary to JUSTICE GREEN's view, Laura's claims also involve church beliefs on demonic possession and how discussions about demons at the church affected Laura emotionally and psychologically.

Before the mandamus proceeding, the Schuberts sought discovery about the defendants' beliefs and practices, and, even before the litigation, Tom Schubert and Senior Pastor McCutchen discussed demonic possession and the appropriateness of exorcism in the church. This discussion caused McCutchen to meet with Rod Linzay to confirm the youth minister's theological understanding of church tenets, including the "laying of hands." In their original petition, the Schuberts alleged that Laura was in serious emotional and physical distress during the Wednesday night youth service and did not want anyone touching her or praying for her. They further alleged she was restrained and held to the floor against her will and that an exorcism was performed in which the youth minister led the youth group in prayer, demanding that the Devil leave Laura's body. The Schuberts alleged that this restraint caused Laura's emotional injuries. However, because the religious practice of "laying hands" and church beliefs about demons are so closely intertwined with Laura's tort claim, assessing emotional damages against Pleasant Glade for engaging in these religious practices would unconstitutionally burden the church's right to free exercise and embroil this Court in an assessment of the propriety of those religious beliefs. *See United States v. Ballard,* 322 U.S. 78, 86–88, 64 S.Ct. 882, 88 L.Ed. 1148 (1944); *see also Tilton,* 925 S.W.2d at 682.

Although the Free Exercise Clause does not categorically insulate religious conduct from judicial scrutiny, it prohibits courts from deciding issues of religious doctrine. *See Serbian E. Orthodox Diocese for the U.S. and Can. v. Milivojevich,* 426 U.S. 696, 709–10, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976); *see also Westbrook,* 231 S.W.3d at 396. CHIEF JUSTICE JEFFERSON asserts, however, that we go too far in protecting religious doctrine in this case, and, in effect, eliminate mental anguish as an element of damage against tortfeasors who allege their conduct was motivated by religious conviction. 264 S.W.3d at 13 (Jefferson, C.J., dissenting). That, of course, is not our intent.

■■ We do not mean to imply that "under the cloak of religion, persons may, with impunity," commit intentional torts upon their religious adherents. *See Cantwell,* 310 U.S. at 306, 60 S.Ct. 900. Freedom to believe may be absolute, but freedom of conduct is not, and "conduct even under religious guise remains subject to regulation for the protection of society." *Tilton,* 925 S.W.2d at 677; *see generally Bowie v. Murphy,* 271 Va. 127, 624 S.E.2d 74, 79–80 (2006) (defamation claim that deacon had been falsely accused of assaulting a church member); *Jones v. Trane,* 153 Misc.2d 822, 591 N.Y.S.2d 927, 931 (N.Y.1992) (sexual misconduct of priest); *Strock v. Pressnell,* 38 Ohio St.3d 207, 527 N.E.2d 1235, 1237 (1988) (minister's affair with wife of couple in marital counseling); *Hester v. Barnett,* 723 S.W.2d 544, 558–59 (Mo.Ct.App.1987) (minister spread false accusations after family counseling); *Christofferson v. Church of Scientology,* 57 Or.App. 203, 644 P.2d 577, 601–02 (1982) (fraudulent misrepresentations), *cert. denied,* 459 U.S. 1206, 103 S.Ct. 1196, 75 L.Ed.2d 439 (1983). Moreover, religious practices that threaten the public's health, safety, or general welfare cannot be tolerated as protected religious belief. *See Tilton,* 925 S.W.2d at 677 (recognizing that free exercise clause does not protect actions "in violation of social duties or subversive to good order"); *see also Cantwell,* 310 U.S. at 306, 60 S.Ct. 900 (noting that religious solicitation does not disrupt the public's peace and good order); *Sands v. Living Word Fellowship,* 34 P.3d 955, 958 (Alaska 2001) (religious conduct must not "pose some substantial threat to public safety, peace or order"); *Guinn v. Church of Christ of Collinsville,* 775 P.2d 766, 774 (Okla.1989) (finding disciplinary action against parishioner not a threat to public safety, peace, or order). But religious practices that might offend the rights or sensibilities of a non-believer outside the church are entitled to greater latitude when applied to an adherent within the church. *See Smith v. Calvary Christian Church,* 462 Mich. 679, 614 N.W.2d 590, 593 (2000) (tort claim rejected because of church member's consent to religious discipline as a matter of law); *Guinn,* 775 P.2d at 774 ("people may freely consent to being spiritually governed by an established set of ecclesiastical tenets defined and carried out by those chosen to interpret and impose them"). Particularly, when the adherent's claim, as here, involves only intangible, emotional damages allegedly caused by a sincerely held religious belief, courts must carefully scrutinize the circumstances so as not to become entangled in a religious dispute. *Murphy,* 571 N.E.2d at 346–48 (rejecting plaintiffs' claims of intentional infliction of emotional distress caused by scriptural passages that referred to women as evil and inferior to men); *Molko v. Holy Spirit Assn.,* 46 Cal.3d 1092, 252 Cal.Rptr. 122, 762 P.2d 46, 64 (1988) (denying plaintiff's false imprisonment claim against church for telling plaintiff her family "would be damned in Hell forever" if she left the church); *Lewis v. Holy Spirit Assn. for the Unification of World Christianity,* 589 F.Supp. 10, 12 (D.Mass.1982) (rejecting claim for "brainwashing and indoctrination" that led to plaintiff's "severe psychiatric disorders"); *Christofferson,* 644 P.2d at 580 (denying plaintiff's claim against church's alleged "scheme to gain control of [plaintiff's] mind"). And while we can imagine circumstances under which an adherent might have a claim for compensable emotional damages as a consequence of religiously motivated conduct, this is not such a case.

■ The "laying of hands" and the presence of demons are part of the church's belief system and accepted as such by its adherents. These practices are not nor-

mally dangerous or unusual and apparently arise in the church with some regularity. They are thus to be expected and are accepted by those in the church. That a particular member may find the practice emotionally disturbing and non-consensual when applied to her does not transform the dispute into a secular matter. "Courts are not arbiters of religious interpretation," and the First Amendment does not cease to apply when parishioners disagree over church doctrine or practices because "it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith." *Thomas v. Review Bd.*, 450 U.S. 707, 716, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). Because determining the circumstances of Laura's emotional injuries would, by its very nature, draw the Court into forbidden religious terrain, we conclude that Laura has failed to state a cognizable, secular claim in this case. *See Ballard,* 322 U.S. at 86, 64 S.Ct. 882.

\* \* \*

The Free Exercise Clause prohibits courts from deciding issues of religious doctrine. Here, the psychological effect of church belief in demons and the appropriateness of its belief in "laying hands" are at issue. Because providing a remedy for the very real, but religiously motivated emotional distress in this case would require us to take sides in what is essentially a religious controversy, we cannot resolve that dispute. Accordingly, we reverse the court of appeals' judgment and dismiss the case.

Chief Justice JEFFERSON filed a dissenting opinion, in which Justice GREEN joined, and in Parts II–A, III, and IV of which Justice JOHNSON joined.

Justice GREEN filed a dissenting opinion.

Justice JOHNSON filed a dissenting opinion.

Chief Justice JEFFERSON, joined by Justice GREEN, and by Justice JOHNSON as to Parts II–A, III, and IV, dissenting.

After today, a tortfeasor need merely allege a religious motive to deprive a Texas court of jurisdiction to compensate his fellow congregant for emotional damages. This sweeping immunity is inconsistent with United States Supreme Court precedent and extends far beyond the protections our Constitution affords religious conduct. The First Amendment guards religious liberty; it does not sanction intentional abuse in religion's name. Because the Court's holding precludes recovery of emotional damages—even for assault and other serious torts—where the defendant alleges that the underlying assault was religious in nature, I respectfully dissent.

I

Ironically, much of my analysis mirrors that found in Pleasant Glade's earlier plea to the court of appeals. *See, e.g., infra* note 9. In its successful petition for a writ of mandamus, Pleasant Glade conceded that Schubert's claim for assault, battery, and false imprisonment presented a " 'secular controversy' and does not come within the protection of the First Amendment. That is, no church or pastor can use the First Amendment as an excuse to cause bodily injury to any person." In the subsequent appeal, the court of appeals held that Pleasant Glade, having received mandamus relief to exclude religious references at trial, was precluded from raising a First Amendment defense that it had quite purposefully abandoned. 174 S.W.3d 388,

407. The Court holds that it is not. In light of the Court's ultimate dismissal for want of jurisdiction, however, I find the Court's protracted discussion of judicial estoppel puzzling. Subject-matter jurisdiction cannot be conferred by estoppel, *Van Indep. Sch. Dist. v. McCarty*, 165 S.W.3d 351, 354 (Tex.2005), or waiver, *Tellez v. City of Socorro*, 226 S.W.3d 413, 414 (Tex. 2007), so the estoppel issue would seem, technically, beyond the Court's reach.[1] The Court has nevertheless expounded on this question, and because the Court errs in its analysis, I offer a brief rejoinder.

The Court states that Pleasant Glade is not judicially estopped from making its First Amendment arguments because, among other reasons, "the asserted inconsistency did not arise in a prior proceeding, but in this same case," 264 S.W.3d 1, 6, and "[c]ontradictory positions taken in the same proceeding ... do not invoke the doctrine of judicial estoppel," *id.* at 6. That characterization misses the mark. The United States Supreme Court recently discussed the policy considerations underlying judicial estoppel and the rationale behind the requirement that parties succeed in a prior proceeding:

> [C]ourts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create *the perception that either the first or the second court was misled.* Absent success in a prior proceeding, a party's later inconsistent position introduces *no risk of inconsistent court determinations,* and thus poses little threat to judicial integrity.

*New Hampshire v. Maine,* 532 U.S. 742, 750–51, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (citations omitted) (emphasis added). This Court's formalistic conception of "prior proceedings" will fail to capture many situations that implicate these concerns. If a party obtains mandamus relief from this Court by taking one position and then wins a judgment, also from this Court, as part of the same suit and based on the opposite contention, this no less creates the "perception that either the first or the second court was misled" and presents the "risk of inconsistent court determinations" than if the mandamus proceeding had originated from a different action. *Id.* The appropriate test to determine if there has been a prior proceeding for the purposes of judicial estoppel is whether the court has made a ruling—or "determination"—on the issue. *Id.* Thus, parties would be able to reverse course before the court has ruled, but could be bound by their previous position once successful (and if the other elements of judicial estoppel are present).[2]

Although I agree, for the reasons discussed below, *see infra* n. 12, that Pleasant Glade is not estopped under these facts, the Court arrives at the estoppel question improvidently and reaches a conclusion that will limit Texas courts' ability to preserve judicial integrity.

---

1. The fact that "[judicial estoppel] is not strictly speaking estoppel but rather is a rule of procedure", 264 S.W.3d 6, does not affect this analysis. *See Wilmer–Hutchins Indep. Sch. Dist. v. Sullivan,* 51 S.W.3d 293, 294–95 (Tex.2001) ("A party cannot by his own conduct confer jurisdiction on a court when none exists otherwise.").

2. Courts have the option of reversing their previous determination rather than invoking judicial estoppel, thus holding the party to the second of its inconsistent arguments rather than the first. *See New Hampshire,* 532 U.S. at 750, 121 S.Ct. 1808 ("Because the rule is intended to prevent improper use of judicial machinery, judicial estoppel is an equitable doctrine invoked by a court at its discretion.") (citations omitted).

## II

### A

The rights contained in the Free Exercise and Establishment Clauses are among our most cherished constitutional freedoms. As broad as these protections are, I agree with the Court that " 'under the cloak of religion, persons may [not], with impunity,' commit intentional torts upon their religious adherents." 264 S.W.3d at 12 (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 306, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)). Unfortunately, this is precisely what the Court's holding allows. Here, assuming all facts favorable to the verdict, members of Pleasant Glade restrained Schubert on two separate occasions against her will. During the first encounter, seven members pinned her to the floor for *two hours* while she cried, screamed, kicked, flailed, and demanded to be released. This violent act caused Schubert multiple bruises, carpet burns, scrapes, and injuries to her wrists, shoulders, and back. As she testified, "I was being grabbed by my wrists, on my ankles, on my shoulders, everywhere. I was fighting with everything I had to get up, I was telling them, no. I was telling them, let go, leave me alone. They did not respond at all." After Schubert "complied with what they wanted [her] to do," she was temporarily released. Fifteen minutes later, at the direction of Pleasant Glade's youth pastor, a different group of seven church members physically restrained her for an hour longer. After this experience, Schubert was "weak from exhaustion" and could hardly stand.

Three days later, a male church member approached Schubert after a service and put his arm around her shoulders. At this point, Schubert was still trying to figure out "what had happened" at the previous incident, "wasn't interested in being touched," and resisted him. As Schubert testified, "I tried to scoot away from him. He scooted closer. He was more persistent. Finally, his grasp on me just got hard ... before I knew it, I was being grabbed again." Eight members of Pleasant Glade then proceeded to hold the crying, screaming, seventeen year-old Schubert spread-eagle on the floor as she thrashed, attempting to break free. After this attack, Schubert was unable to stand without assistance and has no recollection of events immediately afterward. On both occasions, Schubert was scared and in pain, feeling that she could not breathe and that "somebody was going to break [her] leg," not knowing "what was going to happen next."

The jury found that petitioners assaulted and falsely imprisoned Schubert, and the trial court rendered judgment for her on the false imprisonment claim. Although this case presents an unusual set of facts, involving physical restraint not proven to be part of any established church practice, at its core the case is about secular, intentional tort claims squarely within our jurisdiction, and I believe the Court errs in dismissing for want thereof. I will address each of the Court's arguments in turn. First, the Court states that because Schubert's "proof at trial related solely to her subsequent emotional or psychological injuries," her "case at trial then was not significantly different from what she would have presented under her claim of intentional infliction of emotional distress ... [a] type of claim [that] would necessarily require an inquiry into the truth or falsity of religious beliefs that is forbidden by the Constitution." 264 S.W.3d at 12 (citations omitted). As an initial matter, this is factually inaccurate. Schubert testified that she suffered *physical* as well as emotional injuries from the assaults. Furthermore, the jury awarded damages for unsegregated past "physical pain and mental an-

guish." Pleasant Glade did not request that the damages be segregated, and so waived any complaint that her physical injuries were not compensable. TEX.R. CIV. P. 274.

More importantly, the Court's allusion to intentional infliction of emotional distress fails to explain how submitting Schubert's emotional damages claim would "require an inquiry into the truth or falsity of religious beliefs," "embroil this Court in an assessment of the propriety of . . . religious beliefs," or "decid[e] issues of religious doctrine." 264 S.W.3d at 15, 11, 11 (citations omitted). In *Tilton v. Marshall*, 925 S.W.2d 672, 682 (Tex.1996), we held that intentional infliction of emotional distress claims based on insincere religious representations and breached promises to read, touch, and pray over tithes and prayer requests were barred by the First Amendment. We explained:

> One of the elements that a plaintiff must prove to establish intentional infliction of emotional distress is that the conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." With regard to religious representations, we conclude that no conscientious fact finder would make such a determination without at least considering the objective truth or falsity of the defendants' beliefs, regardless of what evidentiary exclusions or limiting instructions were attempted. After all, the outrageousness and extremity of a representation is, under almost any circumstance, ag-

gravated by being false or mitigated by being true.

925 S.W.2d at 681. This case is not like *Tilton*. False imprisonment does not require a showing of outrageous conduct.[3] Evaluating whether Pleasant Glade falsely imprisoned Schubert does not require the factfinder to determine "the objective truth or falsity of the defendants' belief," *id.*, and neither does awarding her emotional damages. It is a basic tenet of tort law that emotional damages may be recovered for intentional torts involving physical invasions, such as assault, battery, and false imprisonment. *See, e.g., Dillard Dep't Stores, Inc. v. Silva*, 148 S.W.3d 370, 374 (Tex.2004) (affirming award of mental anguish damages for false imprisonment); *Fisher v. Carrousel Motor Hotel, Inc.*, 424 S.W.2d 627, 630 (Tex.1967) ("Personal indignity is the essence of an action for battery."); *Davidson v. Lee*, 139 S.W. 904, 907 (Tex.Civ.App.–Galveston 1911, writ ref'd) ("The rule that damages cannot be recovered for mental suffering unaccompanied by physical injury is not applicable when the wrong complained of is a willful one intended by the wrongdoer to wound the feelings and produce mental anguish and suffering, or from which such result should be reasonably anticipated, as a natural consequence."); RESTATEMENT (SECOND) OF TORTS, § 905 cmt. c (1965) ("The principal element of damages in actions for battery, assault or false imprisonment . . . is frequently the disagreeable emotion experienced by the plaintiff."); W. PAGE KEETON ET AL., PROSSER AND KEETON ON TORTS § 11 (5th ed. 1984) ("Since the injury [resulting from false imprisonment] is in

---

**3.** The elements of intentional infliction of emotional distress are: "(1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the emotional distress that the plaintiff suffered was severe." *City of*

*Midland v. O'Bryant*, 18 S.W.3d 209, 216 (Tex.2000). The elements of false imprisonment, on the other hand, are "(1) willful detention; (2) without consent; and (3) without authority of law." *Wal–Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex.2002).

large part a mental one, the plaintiff is entitled to damages for mental suffering, humiliation, and the like."); 20 WILLIAM V. DORSANEO III, TEXAS LITIGATION GUIDE § 331.06 (2007) ("Mental suffering caused by a false imprisonment, including humiliation, shame, fright, and anguish, is also compensable, regardless of whether any physical harm was inflicted on the plaintiff."); cf. Boyles v. Kerr, 855 S.W.2d 593, 597–98 (Tex.1993) ("Our decision [that there is no general duty not to negligently inflict emotional distress] does not affect a claimant's right to recover mental anguish damages caused by defendant's breach of some other legal duty.... We also are not imposing a requirement that emotional distress manifest itself physically to be compensable.") (emphasis added) (citations omitted). This is common sense: many experiences—including some sexual assaults and certain forms of torture—are extremely traumatic yet result in no serious physical injury.

Given this, it is not surprising that the Court cites no case holding that the First Amendment bars claims for emotional damages arising from assault, battery, false imprisonment, or similar torts. I can cite a case, heavily relied upon by the Court, for the opposite proposition: Tilton. There we held that "[t]he Free Exercise Clause never has immunized clergy or churches from all causes of action alleging tortious conduct," and cited Meroni v.

Holy Spirit Association for the Unification of World Christianity, 119 A.D.2d 200, 506 N.Y.S.2d 174 (N.Y.App.Div.1986), with the parenthetical " '[A] church may be held liable for intentional tortious conduct on behalf of its officers or members, even if that conduct is carried out as part of the Church's religious practices.' " Tilton, 925 S.W.2d at 677. The Court cites Cantwell v. Connecticut, 310 U.S. at 310, 60 S.Ct. 900, for the proposition that "intangible harms" are "insufficient to impose civil or criminal liability." 264 S.W.3d at 9. The Cantwell Court, however, found in that case "no assault or threatening of bodily harm, no truculent bearing, no intentional discourtesy, no personal abuse," and made clear that "violence and breaches of the peace," such as occurred in this case, may be punished. Cantwell, 310 U.S. at 310, 60 S.Ct. 900. The Court also discusses Paul v. Watchtower Bible & Tract Society of New York, Inc., 819 F.2d 875 (9th Cir. 1987), but that case rested on the fact that "[n]o physical assault or battery occurred." Paul, 819 F.2d at 883. Similarly, in Westbrook v. Penley, we cited the "[n]o physical assault" language from Paul and stated that the act at issue was not "an intentional tort that endangered Penley's or the public's health or safety." 231 S.W.3d 389, 404 (Tex.2007).[4]

I agree with the Court that certain claims for emotional damages are barred

---

4. In contrast, the tort of intentional infliction of emotional distress was developed because it was thought that extreme and outrageous conduct should be actionable despite the lack of a physical invasion or another otherwise tortious act, and is sometimes criticized because it compensates plaintiffs for mental anguish not naturally flowing from such an act, which may be mere speech. See RESTATEMENT (SECOND) OF TORTS, § 46 cmt. b (1965) ("[E]motional distress may be an element of damages in many cases where other interests have been invaded, and tort liability has arisen apart from the emotional distress. Because of the fear of fictitious or trivial claims, distrust of the proof offered, and the difficulty of setting up any satisfactory boundaries to liability, the law has been slow to afford independent protection to the interest in freedom from emotional distress standing alone. It is only within recent years that the rule stated in this Section has been fully recognized as a separate and distinct basis of tort liability, without the presence of the elements necessary to any other tort, such as assault, battery, false imprisonment, trespass to land, or the like.") (emphasis added).

by the First Amendment—if Schubert were merely complaining of being expelled from the church, she would have no claim in the civil courts. But again, this case, as it was tried, is not about beliefs or "intangible harms"—it is about violent action—specifically, twice pinning a screaming, crying teenage girl to the floor for extended periods of time. That was how it was presented to the jury, which *heard almost nothing about religion during the trial* due to the trial court's diligent attempt to circumvent First Amendment problems and to honor the court of appeals' mandamus ruling that neither side introduce religion as a reason for Laura's restraint.[5] Indeed, the trial court told the jury at the beginning of the case that "the Court of Appeals, the appellate courts, have instructed us that we don't get into spiritual matters because it would violate the [E]stablishment [C]lause of the First Amendment of the Constitution," and later repeated this instruction. That the Court looks to a dictionary for evidence of Pleasant Glade's beliefs and practices is proof of the trial court's success in keeping religion out of the courtroom. *See* 264 S.W.3d at 14, n. 2. Thus, the Court's assertion that assessing emotional damages against

Pleasant Glade for engaging in these religious practices "would ... embroil this Court in an assessment of the propriety of those religious beliefs" is belied by the conduct of this very case: Schubert testified that she was "grabbed" after collapsing due to illness; Pleasant Glade contested that version of events without reference to demons, "laying of hands," or other religious subjects, 264 S.W.3d at 11; and the jury was able to award damages without considering—or even being informed of—Pleasant Glade's beliefs.[6]

Further, although the Court chooses to conduct its own inquiry into the role of "laying hands" in Pleasant Glade's religion,[7] and attempts to limit its holding by stating that "religious practices that threaten the public's health, safety, or general welfare cannot be tolerated," and thus that there may be some cases in which emotional damages are available as a consequence of religiously motivated conduct, 264 S.W.3d at 12, any religious motivation Pleasant Glade may have had is irrelevant to our consideration. The tort of false imprisonment is a religiously neutral law of general applicability, and the First Amendment provides no protection against

5. In order to reach the conclusion that "the religious practice of 'laying hands' and church beliefs about demons are [] closely intertwined with Laura's tort claim," the Court quotes testimony on Pleasant Glade's religious beliefs and practices that the jury did not hear, and references claims made in Schubert's original, unamended petition, 264 S.W.3d at 11, which was filed before Pleasant Glade's successful mandamus petition, *In re Pleasant Glade Assembly of God,* 991 S.W.2d 85, 87–88 (Tex.App.–Fort Worth 1998, orig. proceeding). Schubert subsequently amended her petition, and the live pleading in this case makes reference to neither "exorcism" nor "the Devil."

6. As discussed below, I think it possible that some of Schubert's emotional damages stemmed from protected religious speech and

should not have been awarded. Pleasant Glade failed to preserve error on this point, however, and the Court errs in holding *all* of Schubert's damages—some of which certainly resulted from the restraint itself—barred. *See infra* Part II.B.

7. In reaching the conclusion that "the act of 'laying hands' is infused in Pleasant Glade's religious belief system," 264 S.W.3d at 11, the Court engages in the unconstitutional conduct it purports to avoid: "deciding issues of religious doctrine." *Id.* at 11; *see Employment Div. v. Smith,* 494 U.S. 872, 887, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) ("Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim.").

it. *Employment Div. v. Smith*, 494 U.S. 872, 879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) ("[T]he right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).") (citations omitted); *Moses v. Diocese of Colo.*, 863 P.2d 310, 320 (Colo. 1993) ("Application of a secular standard to secular conduct that is tortious is not prohibited by the Constitution."). The *Smith* Court emphatically rejected the proposition that the First Amendment alone—without being coupled to another constitutional protection, such as the freedom of speech, the press, or to direct the education of one's children, 494 U.S. at 881, 110 S.Ct. 1595—"could excuse [an individual] from compliance," *id.* at 879, 110 S.Ct. 1595, with a general applicable law:

Laws ... are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices.... Can a man excuse his practices to the contrary because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself.

*Id.* at 879, 110 S.Ct. 1595 (quoting *Reynolds v. United States*, 98 U.S. 145, 166–67, 25 L.Ed. 244 (1878)).[8]

To be clear, even if it had been proven at trial that Pleasant Glade's religion demanded that Schubert be restrained, the First Amendment would provide no defense—we simply need not evaluate the validity of Pleasant Glade's religious beliefs, or even inquire into the assailants' motives, to hold Pleasant Glade liable for its intentionally tortious conduct.[9] And

---

**8.** The Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb–2000bb–4, purported to overrule *Smith* by requiring a compelling state interest to substantially burden a person's religious practice. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006). Although the Court cites *Tilton* for support, *Tilton* did not consider the application of *Smith* because *Tilton* was decided before RFRA was held to be beyond Congress's legislative authority to enact with respect to the states in *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). *See Tilton*, 925 S.W.2d at 676 n. 5 (noting that various courts had held RFRA constitutional). Thus, insofar as statements in *Tilton* conflict with *Smith*, they should no longer be considered authoritative.

**9.** Even Pleasant Glade realizes this fundamental principle of First Amendment law. Its petition for writ of mandamus stated:

[Schubert] alleges that she was physically grasped, taken and held on the floor of the church against her will. This was allegedly done as part of an "exorcism" in an alleged attempt to exorcise a demon from her. However, this religious context is actually irrelevant. Since Laura Schubert alleges she was held on the floor against her will, she brings claims for assault, battery, and false imprisonment. This is a "bodily injury" claim ... Relators, the church and the pastors, concede that this is a "secular controversy" and does not come within the protection of the First Amendment. That is, no church or pastor can use the First Amendment as an excuse to cause bodily injury to any person....

\* \* \*

If this were the sum total of this dispute, Relators would not be here before this Court ... No religious beliefs would be implicated. The First Amendment and the free exercise of religion would simply not be an issue.

264 S.W.3d at 7. Although the Court somehow concludes from this statement that "Pleasant Glade viewed the Schuberts' claims of emotional damages as religious in nature," it is plain from the text that the Church made no such distinction. And Pleasant Glade was correct not to do so: no religious beliefs are implicated by awarding Schubert mental anguish damages suffered as a result of her false imprisonment. *But cf. infra* note 12.

while the Court suggests that imposing this liability would have a "chilling effect" on the church's beliefs, 264 S.W.3d at 10, constitutional protection for illegal or tortious conduct cannot be bootstrapped from the protection of beliefs where it does not otherwise exist. Further, the Court's threat to "health, safety, or general welfare" test for liability for religiously motivated acts is almost identical to the "substantial threat to public safety, peace or order" language from *Sherbert v. Verner*, 374 U.S. 398, 403, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). In *Smith*, however, the Court expressly rejected the application of *Sherbert*, which developed out of an unemployment compensation case, to "generally applicable prohibitions of socially harmful conduct." *Smith*, 494 U.S. at 885, 110 S.Ct. 1595.[10]

And even under the Court's erroneous standard, it is hard to see why this case would not qualify. The torts of false imprisonment and assault both have substantially similar criminal analogs, *see* TEX. PENAL CODE §§ 20.02 ("Unlawful Restraint"), 22.01 ("Assault"), and it cannot be seriously argued from this record that Pleasant Glade's conduct did not threaten Schubert's welfare. It is difficult to determine what *would* meet the Court's standard, not least because the Court offers no analysis beyond its declaration that "this is not such a case." Finally, the Court hints that it might have found liability here if Schubert had been a passerby, but that "religious practices that might offend the rights or sensibilities of a non-believer out-

side the church are entitled to greater latitude when applied to an adherent within the church." 264 S.W.3d at 12. There is a kernel of truth in this statement, but the Court's formulation is imprecise and overbroad. Members of religious groups routinely and impliedly consent to a variety of faith-based practices. Accordingly, implied consent could, in many circumstances, extend to physical encounters like baptisms and to other practices congregants embrace as part of their faith. And perhaps this type of implied consent could, in some circumstances, extend to being pinned to the floor for hours at a time despite the member's explicit, contemporaneous withdrawal of consent. That question is not before us today, however. Consent is a question of fact—indeed, lack of consent is an element of false imprisonment on which we have an affirmative jury finding in this case. Pleasant Glade did not challenge that finding at the court of appeals, and does not raise it here. Nevertheless, the Court treats church membership as an across the board buffer to tort liability.[11] The problems with this approach are obvious. It is impossible to apply the Court's standard in the absence of factual development or determination in the trial court. We are in no position to decide that the ordeal to which Schubert was subjected was so "expected" and "accepted by those in the church" as to overcome Schubert's vehement denial of consent at the time of the incidents. 264 S.W.3d at 13. Further, the scant evidence

---

10. The Court cites *Sands v. Living Word Fellowship*, 34 P.3d 955, 958 (Alaska 2001), for the proposition that "religious conduct must not pose 'some substantial threat to public safety, peace or order.'" 264 S.W.3d at 12. This language is taken from *Sherbert* by way of *Frank v. State*, 604 P.2d 1068, 1070 (Alaska 1979), and the *Sands* court did not analyze the effect of *Smith* on its precedent.

11. While the Court cites *Smith v. Calvary Christian Church*, 462 Mich. 679, 614 N.W.2d 590, 593 (2000), that case is clearly inapposite. There, the plaintiff "explicitly consented in writing to obey the church's law," *id.*, and, in any case, the court specifically reserved the question of whether its reasoning would extend to church discipline "in violation of the Michigan Penal Code," *id.* at 595.

does not support the Court's conclusion. Senior Pastor McCutchen, in his affidavit quoted by the Court, speaks of "lay[ing] hands" and of church members "faint[ing] into semi-consciousness, and sometimes l[ying] down on the floor of our church." *Id.* at 10. This is far removed from the incident described by Schubert, which we must take as true even if Pleasant Glade had properly raised this issue, *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005) ("[L]egal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not."), and lends no credence to the Court's consent theory.

## B

To the extent that this case presents any First Amendment problems, I believe they lie in the fact that Schubert was traumatized not only by the false imprisonment viewed in isolation, but also by the religious content of that experience. Thus, because one of Schubert's experts, Dr. Helge, testified as to the whole of Schubert's mental anguish, the jury may have awarded damages stemming in part from the religious nature of the events in question. 264 S.W.3d at 9–10. This is prohibited by the First Amendment. *Paul*, 819 F.2d at 883. As discussed above, however, the general rule in Texas is that plaintiffs may recover mental anguish damages resulting directly from certain types of intentional torts, including false imprisonment. Thus, the difficulty in this type of hybrid case lies in separating the wheat from the chaff.

The Court solves this dilemma not by extracting the religious from the secular, but by binding them together and then dismissing the case for lack of jurisdiction. I would, instead, treat Pleasant Glade's First Amendment argument as an affirmative defense that must be raised at trial. *See* Tex.R. Civ. P. 94; *cf. Tilton*, 925 S.W.2d at 677 ("[W]hen a plaintiff's suit implicates a defendant's free exercise rights, the defendant may assert the First Amendment as an affirmative defense to the claims against him."). A jury could then be instructed to award damages only for the mental anguish the plaintiff would have suffered had the tort been committed by a secular actor in a secular setting. Juries are frequently asked to exclude certain sources of injury—in this case religious sources—when calculating damages, and this procedure would allow plaintiffs' secular claims to go forward while protecting defendants' First Amendment rights. *See* COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES—GENERAL NEGLIGENCE & INTENTIONAL PERSONAL TORTS PJC 8.7 (2006) Personal Injury Damages—Exclusionary Instruction for Other Condition ("Do not include any amount for any condition *not resulting from* the occurrence in question") (emphasis original), & cmt. ("If it would add clarity in the individual case, an instruction not to consider specific, named ... conditions would be proper, if requested."); *see also id.* at PJC 8.8 Personal Injury Damages—Exclusionary Instruction for Preexisting Condition That Is Aggravated, 8.9 Personal Injury Damages—Exclusionary Instruction for Failure to Mitigate. Further, if the case is tried without reference to religion, making an exclusionary instruction potentially confusing or prejudicial, the trial court could in these situations include a proximate cause question, which includes an element of foreseeability. *See id.* at PJC 2.4 Proximate Cause ("[T]he act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom.") (emphasis omitted). Thus, the jury (not being aware of any religious as-

pect of the case) would find only damages reasonably connected to the secular assault.

Pleasant Glade, however, did not request any such instruction, and this omission bars relief.[12] *See* Tex.R. Civ. P. 278 ("Failure to submit a definition or instruction shall not be deemed a ground for reversal of the judgment unless a substantially correct definition or instruction has been requested in writing and tendered by the party complaining of the judgment."). Further, while the Court points to Dr. Helge's testimony as proof that Schubert's religious and secular damages are inextricably intertwined, another expert, Dr. Millie Astin, specifically stated that she *could* separate the two. And Schubert testified that while she was being restrained she was afraid she "was being injured" and that she "might die"—trauma clearly associated with the act of restraint itself. Although segregating the religious from the secular may sometimes be difficult, it can and should be done. *See Jones v. Wolf,* 443 U.S. 595, 604, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979).

## III

Because I would not dismiss for lack of jurisdiction, I would address Pleasant Glade's argument that the trial court erred in allowing expert testimony on, and recovery for, Schubert's diagnosis of posttraumatic stress disorder. However, because the other evidence of Schubert's mental anguish, including "angry outbursts, weight loss, sleeplessness, nightmares, hallucinations, self-mutilation, fear of abandonment, and agoraphobia," 174 S.W.3d at 393, is sufficient to support the jury's award, I cannot say that the error, if any,

"probably caused the rendition of an improper judgment." Tex.R.App. P. 61.1(a); *Nissan Motor Co. v. Armstrong,* 145 S.W.3d 131, 144 (Tex.2004). It is therefore not necessary to consider Pleasant Glade's claims in any detail.

## IV

Pleasant Glade also contends that the trial court erred in refusing to submit their *in loco parentis* defense to the jury, and that the First Amendment required a finding of actual malice to support the jury's award of mental anguish damages. In a cross petition for review, Schubert argues that the court of appeals erred in concluding there was no evidence to support a finding that Laura's loss of earning capacity was foreseeable and proximately caused by Pleasant Glade's conduct. I agree with the court of appeals' conclusions on these issues.

## V

The Court today essentially bars all recovery for mental anguish damages stemming from allegedly religiously motivated, intentional invasions of bodily integrity committed against members of a religious group. This overly broad holding not only conflicts with well-settled legal and constitutional principles, it will also prove to be dangerous in practice. Texas courts have been and will continue to be confronted with cases in which a congregant suffers physical or psychological injury as a result of violent or unlawful, but religiously sanctioned, acts. In these cases, the Court's holding today will force the lower courts to deny the plaintiff recovery of emotional damages if the defendant alleges that some portion thereof stemmed from the

12. Even under my view of judicial estoppel, Pleasant Glade would not be estopped from arguing that the jury improperly awarded mental anguish damages stemming from the religious implications of the incident, which I interpret to be consistent with the position it took in its mandamus petition.

religious content of the experience—unless the trial court is able to anticipate that the case will fall under the Court's rather vague exception. *See* 264 S.W.3d at 12 ("[W]e can imagine circumstances under which an adherent might have a claim for compensable emotional damages as a consequence of religiously motivated conduct.").

I would affirm the court of appeals' judgment. Because the Court instead dismisses the case for lack of jurisdiction, I respectfully dissent.

Justice GREEN filed a dissenting opinion.

Because the fundamental principles of Texas common law do not conflict with the Free Exercise Clause, courts can and should decide cases like this according to neutral principles of tort law. *See Employment Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 876–90, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990); *Jones v. Wolf*, 443 U.S. 595, 602–06, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979). If a plaintiff's case can be made without relying on religious doctrine, the defendant must be required to respond in kind.[1] Though not always a simple task for courts, "the promise of nonentanglement and neutrality inherent in the neutral-principles approach more than compensates for what will be occasional problems in application." *Jones*, 443 U.S. at 604, 99 S.Ct. 3020. In con-

trast, today's decision ignores the rule that "courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim," *Smith*, 494 U.S. at 887, 110 S.Ct. 1595, replacing it with a far more dangerous practice: a judicial attempt to "balance against the importance of general laws the significance of religious practice," *id.* at 889 n. 5, 110 S.Ct. 1595. "The First Amendment's protection of religious liberty does not require this." *Id.* at 889, 110 S.Ct. 1595. The trial court heeded these admonishments, but the Court today does not. For these reasons, and for those expressed by the Chief Justice, I respectfully dissent.

Justice JOHNSON, dissenting.

I dissent for the reasons stated below, as well as for the reasons stated by Chief Justice Jefferson in parts II–A, III, and IV of his dissent, which I join.

Pleasant Glade's[1] position on damages in its mandamus action and in this appeal is set out by the Court as follows:

> Pleasant Glade's mandamus petition, however, merely distinguished Laura's bodily injury claims from her emotional damage claims. That distinction is consistent with its present appellate contention that the award of damages for Laura's emotional injury is barred by the First Amendment. . . . Pleasant Glade

---

1. This case is not about sanctioning voluntary religious practices. If Schubert had consented to the church's actions, the consent—under our familiar, neutral principles of tort law—would have completely defeated her claims. *See* TEX. PENAL CODE § 22.01(a) (assault elements); *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex.2002) (false imprisonment elements); RESTATEMENT (SECOND) OF TORTS § 892A (1979) (effect of consent); *cf. Tex. Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 508 (Tex.1980) (consent as a matter of law). The jury, however, found that Schubert had not consented, and Pleasant

Glade does not challenge that conclusion. When faced with an otherwise valid tort claim, Pleasant Glade's religious motivation is not a defense. *See Smith*, 494 U.S. at 876–90, 110 S.Ct. 1595.

1. Laura's suit was against Pleasant Glade Assembly of God Church, its senior pastor, youth minister, and several individual members of the church. All the defendants will be referred to collectively as "Pleasant Glade" or "the church."

argues on appeal that the First Amendment protects it from liability for Laura's emotional injuries connected with its religious practices. . . .

. . . .

. . . [W]e next consider whether the church's religious practice of "laying hands" is entitled to First Amendment protection. Pleasant Glade contends the First Amendment protects it against claims of intangible harm derived from its religious practice of "laying hands." 264 S.W.3d at 8. In its brief on the merits, Pleasant Glade specifically disclaims seeking to avoid liability for bodily injuries to Laura:

Petitioners have never claimed that the First Amendment somehow gives them immunity to commit intentional *bodily* injury. Instead, the First Amendment protections prevent religious beliefs and conduct from being put "on trial" to see if psychologists and the general public (the jury) agree with their practices. Tort liability certainly does not disappear. But, it must be limited.

. . . .

. . . If a church or pastor is sued for bodily injury, such as a car wreck or a broken arm, then the First Amendment does not apply.

In this regard, it is notable that Pleasant Glade does *not* make two claims in its appeal that bear on this case. First, the church's position is not that the "laying on of hands" doctrine encompasses forcefully and physically restraining persons and holding them down on the floor for extended periods of time against their will as the evidence here would have allowed the jury to believe was done. Although Senior Pastor McCutchen, in his affidavit, does not specifically disclaim extended physical restraint as being part of the doctrine of "laying on of hands," he intimates as much:

I certainly did not hold Laura Schubert down on the floor of the church, or ever hold her against her will. I did not instruct or direct any one else to do so. I did not see or hear any one else direct people to hold Laura Schubert against her will.

He does not assert in the affidavit that such courses of conduct *do* come within the doctrine. And second, Pleasant Glade does not urge on appeal that damages for physical injuries and pain Laura suffered because of the intentional acts to restrain her are precluded by the First Amendment.

The Court rightly says that freedom of belief may be absolute, but freedom of conduct is not. 264 S.W.3d 12. It then bypasses the difference between Laura's physical pain damages and her mental and emotional anguish by misreading the trial record as containing proof related solely to her subsequent emotional or psychological injuries. Laura testified that while she was going through the two episodes

I was feeling pain. I was feeling—the only thing, I felt like somebody was going to break my leg. I felt like I could not breathe. . . . I had known that I had had the carpet burns and stuff, and I showed them to [my mother]. . . . [T]hey saw the bruises on my shoulders. . . . I lifted up the back of my shirt and showed her all the carpet burns that were on the back of it.

The difficulty with the Court's conclusion and holding is pointed out by Chief Justice Jefferson: Laura claimed damages for physical injuries and pain as well as mental anguish; Pleasant Glade disclaims immunity from damages for physical injuries; there is legally sufficient evidence Laura suffered physical injuries, physical pain, and mental anguish; physical pain and mental anguish were submitted to-

gether in one damages subpart, and the jury found one damages amount; and the church does not challenge the legal sufficiency of the evidence as to physical pain.

Laura's testimony was evidence of, and raised the inference that, she suffered physically and endured both physical pain and mental anguish as a result of the restraints and her struggles against them. Her parents testified that she was bruised and scraped. Not only was there direct evidence of physical injury and pain from the restraints, but it was within the knowledge of the jurors, and the jurors were entitled to infer, that physical pain would accompany the extended forceful physical restraints that resulted in bruises and scrapes. The church did not object to the joint submission of physical pain and mental anguish damages with only one answer blank. Accordingly, the evidence is measured against the charge given. *See St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 530 (Tex.2002) (noting that when the charge is submitted without objection, the sufficiency of the evidence is measured against the charge given). I would hold that there is legally sufficient evidence to support damages for physical injury and pain even if all evidence of Laura's subsequent and ongoing intangible psychological injuries were to be disregarded. Thus, the judgment for damages from physical pain and mental anguish should be upheld.

The Court says that intangible, psychological injury, without more, "cannot ordinarily serve as a basis for a tort claim against a church or its members for its religious practices." 264 S.W.3d at 9. I agree. But rather than preclude recovery for physical injuries and pain such as are involved in this case in which there are also claims for subsequently-occurring emotional injuries that relate to both the physical restraint and religious practices, I would preclude damages for those emo-tional injuries for which there is any evidence of causation by religious beliefs or teachings. This would prevent the "entanglement" with First Amendment issues with which the Court is properly concerned. I would not make that preclusion an affirmative defense as Chief Justice Jefferson advocates because it is hard to see how such an affirmative defense would work in a practical sense. It would require presenting evidence of and, at least to some degree, evaluating the religious beliefs involved. And religious beliefs in many, if not most, instances are not just beliefs—they are among individuals' most deeply-held convictions. Asking jurors to separate themselves from convictions as to their own or another's religious beliefs and to dispassionately evaluate damages related to those beliefs, in my view, asks too much of them.

I would hold that whether alleged mental and emotional damages resulted to any degree from religious beliefs and teachings should be determined by the trial court as a matter of law. Evidence of religious practices and beliefs should be precluded by means of pretrial hearings or motions in limine, as was done for the most part in this case. If the question could not be decided until after all the evidence was presented, the trial court could either direct a verdict as to damages other than those from physical injury and pain or submit separate questions as to each element of damages so the First Amendment issue as to emotional or psychological damages could be properly isolated. The trial court could then consider granting judgment notwithstanding the verdict as to emotional damages. Limiting evidence and submitting a separate damage question for physical injuries and pain protects all interests involved: the individual claiming damages, the church, and members of the church.

I would affirm the judgment of the court of appeals.