# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-17-00777-CV

---

**Arthur J. Lawrence, Jr., Appellant**

**v.**

**Cody Treybig, Appellee**

---

### FROM THE 353RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-16-001856, THE HONORABLE KARIN CRUMP, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

Pro se appellant Arthur J. Lawrence, Jr. appeals from the trial court's final judgment, entered following a jury trial, that awarded nominal damages of $4.00 to appellee Cody Treybig[1] and imposed a permanent injunction barring Lawrence from coming within 1,000 feet of Cody or contacting him or any member of his family.[2] Lawrence complains that the trial court lacked jurisdiction over the case under the Free Exercise Clause of the First Amendment, *see* U.S. Const. amend. I; Tex. Const. art. I, § 6, and that the jury erroneously evaluated the evidence. We will affirm the trial court's judgment.

---

[1] For the sake of clarity, we will refer to Cody Treybig by his first name in this opinion.

[2] Cody asserted a cause of action for intentional infliction of emotional distress and sought injunctive relief and exemplary damages.

## FACTUAL AND PROCEDURAL SUMMARY[3]

In 2005, when Cody was nine years old, his parents hired Lawrence as a private basketball coach. Lawrence continued in that role for six years, until Cody was fifteen, and they formed a relationship that eventually rose to a level of discomfort and concern to Cody's parents, ultimately leading to the underlying suit.[4]

Cody testified that over the years Lawrence was employed by the Treybigs, he told Cody that Jimmy Treybig, Cody's father, was a high-level member of an evil society called the Illuminati; that Cody's school, his hometown of Austin, and colleges in general were full of evil Illuminati members; that the rapture was imminent; that Cody's parents intended to have an RFID[5] chip implanted into Cody's body, which would damn him to hell; that the RFID chip would control Cody's mind and would contain cyanide that could be used to kill him if he resisted; and that Cody's parents and brother hated him and were evil. Lawrence also showed Cody videos of beheadings, saying that something similar would happen if Cody did not "save [his] soul" first. Cody said that Lawrence made Cody feel isolated from his friends by telling him "over and over" that they were evil and influenced by the devil. Asked about whether he came to believe his father was part of the Illuminati, Cody said, "I was absolutely convinced. It was the truth for me, and at the time, it was factual that Mr. Lawrence told it to me. He knew God. God had told him, and that it was absolutely the case."

In 2009, when Cody was about twelve, he went to his parents in tears, telling them that that he was frightened because Lawrence had said that Cody would go to hell for

---

[3] Our summary of the evidence is taken from the testimony and exhibits presented at trial.

[4] At the time of trial, Cody was twenty-one years old.

[5] "RFID" stands for "radio-frequency identification."

playing a particular video game. Cody's parents both confronted Lawrence and told him not to discuss religious matters with their son, and they testified that Lawrence apologized and agreed to refrain from such discussions. Cody testified that despite those assurances, Lawrence continued to talk about his religious beliefs, telling Cody to keep the discussions secret from his parents and to lie about the content of their conversations. Cody said that Lawrence "had a way of using his words to make me feel like he had done so much [for] me and I owed him so much." The discussions took place during coaching sessions, in phone calls, and in text messages, and Cody said Lawrence had a way of luring him into asking about Lawrence's views on religion.[6] Cody explained that he and Lawrence developed a code to conceal that they were continuing to have conversations about Lawrence's religious beliefs.

Cody testified that Lawrence "was always trying to convince me that he needed my parents to pay him more." He also said that Lawrence tried to plant ideas of financial misdeeds, at one point telling Cody to get $1,000 from cash that Lawrence believed Cody's father kept in the house and "loan" it to Lawrence. Cody followed Lawrence's instructions but was unable to find any money. In 2012, Lawrence told Cody that he would soon be fired by Cody's father; that Mr. Treybig would pay Lawrence $250,000 in the process to make him leave Cody alone; that Lawrence would keep most of the money in reserve for Cody's needs after the rapture; and that Cody would have to make a false report of child abuse to get away from his parents so that he could go live with Lawrence and Lawrence's followers.

Drew Treybig, Cody's mother, testified that after she told Lawrence to refrain from discussing his views on religion, Cody and Lawrence continued to ask if they could talk

---

[6] The record reflects that Lawrence would tease the fact that he had additional information, asking Cody if he was ready to hear it or if he was sure he wanted to know more.

3

about religion, but that "[t]he answer was no. Every single time, and Cody would get upset with me, . . . but it was no." In September 2011, Cody's older brother told Mrs. Treybig that Cody and Lawrence were still having those discussions, but Cody and Lawrence denied it when she asked. In early 2012, a friend showed Cody's mother "some very distressing" Skype text transcripts she had found between the friend's child and Lawrence. Cody's mother said that when she read them, "I was panic-stricken. Sheer panic took over me." She raced home and looked at Cody's computer, "and the Skype transcripts were just right there, and, um, I just started to read, and it—it was abject terror." Cody's father also testified about reading the text conversations between Cody and Lawrence:

> Well, when I read the Skype, I realized three things: One thing, Mr. Lawrence was evil. That all this time that I had been paying him; working with him, he had been teaching that I was the devil. And that's just the start and you've heard the rest of it. The second thing was he talked about going away with Cody. And he—and I don't remember, yeah, he [was] going away with Cody, taking him away. And the third thing, um, was, um, he implied that people paid him to leave Cody alone or leave the child alone.

Transcripts of Skype texts between Lawrence and Cody, dated between January 14 and February 3, 2012, were introduced into evidence and confirm much of Cody's testimony.[7] In the transcripts, Cody said that his parents were angry and then asked Lawrence if he should give them his phone. Lawrence replied, "Delete everything and give it to them." About two weeks later, Lawrence texted, "FYI, Its here! . . . . R F I D." He further wrote that the chip "is inserted into the hand, preferably the right hand or forehead," and asked if that sounded familiar, and Cody replied, "yes sounds very familiar. In a nice book I read," explaining at trial

---

[7] Any errors in the quotations that follow are found in the Skype transcripts or in the letters sent to the Treybigs by Lawrence after he was fired.

that they were referring to the Bible. Lawrence told Cody to stay away from people who have the chip, and when Cody asked "what do they do to ur body," Lawrence said, "you lose mind control." Lawrence told Cody, "Its imperative that you know what this chip does," because his brother and parents will "accept it" and will "eventually obligate you to take it or either they will be disown you!" For that reason, Lawrence wrote, it was necessary for Cody to "become INDEPENDENT ASAP!" When Cody said he would "rather die than get" the chip, Lawrence urged him to test himself by not eating for two days, acknowledging that it would anger Cody's parents and cause him to miss school and his activities.

Lawrence went on to ask where Cody would live and what he would live on if he ran away instead of accepting the chip. Cody said he had "20000 in my bank," and Lawrence replied that Cody's account was restricted to withdrawals by his parents. Lawrence said that he had "been working on [a plan] ever since [Cody's mother] said she doesn't want you reading the bible." He explained that the Treybigs would fire him because of "RELIGION RELIGION RELIGION" and would "pay me off with a large lump sum of money, like $250,000 or more to have me come up with some excuse to leave." Lawrence told Cody that he would "put it into a safe and wait for you to come and get it." Cody responded, "so your plan is..to accept it..and when I have to leave I can use it to sustain myself as long as Im independent?" Lawrence said, "EXACTLY! CPS![8] You can easily claim abuse! . . . ONE PHONE CALL! 911." Cody asked what he could tell CPS, and Lawrence replied, "Fear of pain, yelling, humiliation, etc. Which is not a lie because they would be forcing you into h_ _ _. CPS ALWAYS takes the side

---

[8] Child Protective Services.

of the child." He also said, "Tell CPS nothing about the chip, stress potential harm to your body and yelling," adding that if Cody's "acting sucks," he would be handed back to his parents.

In the course of their texting, Cody said, "I think that I hate school. Its not important. Its just keeping me from learning about what really important. everyone at my school are just sheep waiting to be slaughtered. I think that I will die before I get this." Lawrence asked Cody if he "want[ed] more," and then told Cody there was a computer in Belgium that would be used to detain people who "don't accept the new world order which is the chip." Lawrence said that Cody's parents were part of the new world order and were "influenced by the other side" and that the Illuminati "will kill you if you don't do as your told." He also scolded Cody for not studying the Bible enough and said God had sent Lawrence to Cody because Cody had been "chosen."

The Treybigs fired Lawrence the day they found the transcripts, telling him to cease all contact with Cody. Despite the Treybigs' request, Lawrence continued to have contact with Cody for some time, sending Cody text messages through friends and speaking on the phone when Cody called. He also sent Cody's father two letters in April and May 2012, criticizing the Treybigs' parenting and asserting that Cody had turned to Lawrence because their parental advice "came up void."

In the first letter, which is eleven pages long, Lawrence took issue with Cody's parents signing him up for a certain basketball team "behind my back" and without "consult[ing]" Lawrence. Lawrence also discussed the family's money at length, saying that the issue "needs to be addressed" because the Treybigs had said contradictory things about their financial resources, which "confuses Cody because it sounds as if you and Drew are trying to make Cody believe you are not very wealthy." Lawrence called Cody's father a "dictator" and

6

"arrogant, boastful, self centered." Lawrence also said, "I began to remember what other rich families did when I didn't sip their kool-aid. I never did anything wrong that would justify why my services should be terminated, so two families in the past have tried to get me to leave on so called good terms by bribing me." In those cases, Lawrence said, he "told their children the truth and just left the family and did not contact those individuals until they were in there early twenties." In the second letter, Lawrence gave advice about Cody's coaching needs and said Cody's father should communicate better with Cody. He closed the letter by saying, "Please DO NOT obligate Cody to go to the Olympics this year, MESSAGE! [Want] to know why? All you have to do is ask and I will show you, but please be sure to prepare your mind for some information that will go beyond anything else that you have EVER encountered; or have you already?"

Mr. Treybig was asked at trial about his interpretation of those letters, and he replied that Lawrence "very clearly stated, again, that Cody really belonged to him." Mrs. Treybig testified similarly, saying about the letters, "I believe that it was his intent to intimidate us. It was his way to continue to stalk Cody, indirectly, um, and it was also his intent to frighten us, that—he was—no matter what happened to Jimmy and I, even if we left this world, he was going to come back for Cody . . . when he was over 18."

Cody's mother said that in the days and weeks after Lawrence was fired,

> I thought we had lost our child. Um, he was crying all the time and sobbing all the time. He couldn't get out of bed. Often times he was curled up in a ball in a catatonic—I'm not medically diagnosing as catatonic but very unresponsive. Um—he couldn't eat; he couldn't focus. He tried. Um, I would take him to school. He couldn't—he stopped driving at that point so I was taking him to school on the days he could go. I was picking him up early because he couldn't stay. Um, he couldn't focus on his tests. He was getting 30s and 40s on tests.

7

The family had planned to go to the 2012 Summer Olympics, but when it was time for them to leave, Mr. Treybig said, Cody "was so frightened that he would die. He had been taught by Mr. Lawrence that he would die at the Olympics." As a result of Cody's fear, the family canceled the trip. Cody's mother testified about Cody's reaction to their preparing to leave for the Olympics:

> So the suitcases were packed. We were ready to go to the airport and I go to get Cody in his room, and, um, I walk in the door; the lights are out; he's in bed; the blankets are over him over his head, he's curled up. He's barely responsive. I can hardly hear what he's saying to me—he's crying, though—and, uh, I couldn't get him to talk to me, so the only thing I could think of was to lay down next to him and I put my arms around him. I remember this really well and, um, I finally got him to tell me what he was so afraid of. And he was terrified that if he left for the Olympics, someone would come to our hotel room, and my husband and I would hold him down and they would kill him. So the only thing that I could think to try to save him in that moment was to tell him if anybody came to the door, they could take me. I would let them kill me. Nothing would ever happen to him again, ever, um, but it wasn't good enough. We didn't go and we cancelled the tickets, about that time.

Cody's parents started sending him to psychiatrist James Maynard soon after Lawrence was fired. Dr. Maynard testified that he believed Cody "was a normal kid, um, prior to his relationship with Mr. Lawrence," that Cody was a "people pleaser," and that Cody "loved Mr. Lawrence, that he worshipped him." He explained that when Cody first met Lawrence, Cody was in "the latency age of development," during which phase "children are compliant" "rule followers" and are not yet asking questions or challenging what they are told. Dr. Maynard said that "as a result of his interactions with Mr. Lawrence," Cody had distanced himself from his friends and was afraid of his parents and his school.

Dr. Maynard testified that at the beginning of his treatment, Cody was suffering from severe anxiety and moderate depression. He was upset over the severing of his relationship with Lawrence and was "terrified that his parents were evil, that they were part of the Illuminati,

8

and that because they had money, they were evil." Cody was also "extremely anxious" about school because he thought that "if he participated in studying evolution, that he would burn in hell." Dr. Maynard said that Cody could not bring himself to call Mr. Treybig "father" and instead "had to call him the Man Who Gave Birth to Me," and that Cody had "learned these things or was afraid of these things because of his relationship with Mr. Lawrence."

Cody testified that Lawrence had isolated and cut him off from his friends and family, causing him lasting emotional trauma and making him distrustful of others. He said that he became afraid of the dark, his parents, and school. As a result of his emotional distress, he had to take a medical leave of absence from school during his junior year of high school. He also became unable to sleep in his own bed and slept in his parents' room during his senior year of high school.

Cody eventually went to Rice University but had difficulty because Lawrence had taught him that colleges were full of evil people and that the owl, which is the Rice mascot, was a symbol of the Illuminati. Cody testified that although he no longer believed everything Lawrence had told him, "what Mr. Lawrence did to me is destroyed the subconscious part of my brain to the point where, even if I understood that Rice was fine, it was so engrained within me, that just being there still hurt me and made me afraid and anxious." At Rice, Cody found that he still could not sleep in his bed because he was afraid Lawrence would "get him." He began sleeping under it, in a space his mother described as "a cave," and eventually took a second medical leave of absence in April of his freshman year of college.

Cody testified that at the time of trial, he had returned to Rice and was doing well. He was still seeing Dr. Maynard at the time of trial and testified that he would continue to need weekly therapy for another year or two. Cody was asked about the lasting effects of Lawrence's

9

conduct, and he said, "It's especially hard for me to talk about my family and having to cope with the fact that this man made me hate my family. I do not know how to describe how that makes me feel." He further said that he has lingering feelings of anxiety or depression, although he can manage it most of the time. However, "every time I talk to somebody in my life, it's hard for me, every single time because it just—I cannot describe the effect it has on the mind when somebody wraps you around their finger and gains—and gains control of you. It—it's just hard to ever be the same and you have to work so hard at it." Cody testified:

> I don't care what belief system you have or how you convince a child that their parents hate them, that their brother is evil, that their parents are evil, that they need to file a false CPS report to go live with you, that they need to try and help to extort $250,000 from your parents, I don't care how you convince a child that that is true, that is going to have lasting and real psychological damage.

He further said, when asked if Lawrence had used religion as a coaching "tool":

> I just don't know of any religions that tell you to come through a family; tear it apart; isolate the kid; lie to CPS. I don't know of any religion or belief system that includes that, so I don't know—it was a tool and so it was present there but I don't know if I can say for sure that it was—it was just religion what the sessions were about. It was about isolation. That was what the sessions were really about. It was about terrifying me and trying to tear my family apart. That's what the sessions were really about.

Cody's mother testified that she often thought of her son and "the daily abuse that he had to suffer, that Mr. Lawrence piled onto him," saying that Lawrence made Cody "fear for his life" and that she did not think "any child should be betrayed like this." Cody's parents testified that Lawrence had recently moved within four to six miles of the Treybigs' home, into a neighborhood where one of Cody's best friends lived. Cody's father said that makes him

10

uncomfortable "because we're afraid of him," and his mother testified that the family now has concerns about running into Lawrence in stores or elsewhere in the community.

For his part, Lawrence testified and denied much of the Treybigs' testimony. For instance, Lawrence said that although Cody's mother initially barred him from discussing religion in 2009 after Cody got upset about the video game, the next day she told him, "I don't really mind if you talk to Cody about the Bible and religion, as long as you only tell him the good stuff." Lawrence said he instead stopped talking about religion altogether, and that when Cody would occasionally bring it up, Lawrence would remind him that his mother had said not to talk about the Bible. Lawrence further testified that Mrs. Treybig "rescinded" her prohibition on religious discussions when Cody was in eighth grade when, he said, the Treybigs asked Lawrence to help Cody with a project for his theology class.[9] He said that he did not tell Cody about the rapture, the Illuminati, or RFID chips until Cody was in eighth grade and that Cody was lying when he testified to the contrary. He denied ever saying Mr. Treybig was evil or a member of the Illuminati, saying, "I believe I have maybe testified that we have all done evil or unrighteous things in the eyes of the father." He further denied keeping secrets from Cody's parents, telling Cody that something bad would happen during the 2012 Olympics, or showing Cody videos of beheadings or other religious materials during Skype chats. He said that their discussions about money and running away with Cody to avoid an RFID chip were all "based on three hypothetical situations." Finally, he denied that his post-firing letters were an attempt to get additional money from the family.

---

[9] The Treybigs all testified that Mrs. Treybig gave Lawrence permission to help with one or two specific theology projects, after repeated requests by Cody, and that he was not given blanket permission to discuss his views on religion.

**DISCUSSION**

Lawrence asserts that the trial court lacked jurisdiction over the underlying lawsuit, arguing that his conduct that allegedly caused Cody's emotional distress was based upon his religious views and thus protected by the First Amendment.

A plaintiff suing for intentional infliction of emotional distress must show that the defendant acted intentionally or recklessly and that the defendant's conduct was extreme and outrageous and caused the plaintiff severe emotional distress. *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993). The conduct must have been so outrageous in character and so extreme in degree "as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (cleaned up).

Both our federal and state constitutions provide broad protection for the free exercise of religion. *Tilton v. Marshall*, 925 S.W.2d 672, 677 (Tex. 1996) (orig. proceeding); *see* U.S. Const. amend. I; Tex. Const. art. I, § 6. "Although the Free Exercise Clause does not categorically insulate religious conduct from judicial scrutiny, it prohibits courts from deciding issues of religious doctrine." *Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 11 (Tex. 2008). "Thus when a plaintiff's suit implicates a defendant's free exercise rights, the defendant may assert the First Amendment as an affirmative defense." *Tilton*, 925 S.W.2d at 677. "One seeking an exemption based on faith from a facially neutral, generally applicable statute, regulation, or common law principle must first demonstrate to the court that the application thereof would substantially burden his or her free exercise of religion." *Id.* That determination generally requires the defendant to establish that his beliefs are both religious in nature and sincerely held. *Id.* at 678. And while courts can consider the sincerity of a person's beliefs, they cannot weigh the "veracity of religious tenets." *Id.* However, courts distinguish

12

between the absolute right to believe and "the freedom to act, which remains subject to regulation for the protection of society." *Id*. at 677 (cleaned up).

Lawrence argues that the jury could not determine whether his conduct was extreme and outrageous without weighing the veracity of his religious beliefs and that the trial court therefore should have dismissed Cody's claims. However, whether Lawrence's views are sincerely held or whether he believed that he was helping to save Cody from damnation is irrelevant under the facts of this case, in which Lawrence's conduct, no matter its motivation, was extreme and outrageous.

First, Cody's claims against Lawrence do not resemble the claims discussed in *Tilton* or *Schubert*. This case does not present claims made against a religious leader by a follower related to the leader's conduct of his religious duties.[10] *See Tilton*, 925 S.W.2d at 681. Nor is it a case in which an adherent of a church is accused of misconduct against another adherent related to or arising out of the beliefs of their common religion.[11] *See Schubert*, 264 S.W.3d at 3-4.

---

[10] In *Tilton*, the plaintiffs sued, inter alia, for fraud and intentional infliction of emotional distress arising from a pastor's allegedly making insincere religious representations and breaching his promises to read, touch, and pray over prayer requests and tithes. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996) (orig. proceeding). The court held that an inquiry into whether the pastor's espoused religious beliefs were true would be required in considering whether his conduct rose to the level of intentional infliction of emotional distress, an inquiry the First Amendment "strictly prohibit[ed]." *Id*. The court held that the same inquiry would be required in considering claims of fraud arising out of his allegedly insincere religious representations. *Id*. at 679-80. Thus, the court held that the trial court had abused its discretion in refusing to dismiss the claims for intentional infliction of emotional distress and fraud claims that involved the veracity of the pastor's religious doctrines or beliefs. *Id*. at 679, 682.

[11] In *Schubert*, the plaintiffs sued for emotional damages arising out of an attempt by members of the victim's former church to cast out demons that they believed were possessing the victim. *Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 3-4 (Tex. 2008). The court ordered the suit dismissed because "the psychological effect of church belief in demons and the

Instead, Lawrence was hired for the purely secular purpose of coaching Cody in basketball. In secret and in direct contravention of his employers' instructions, Lawrence inflicted his belief system on the parents' minor child, who was not a member of Lawrence's religious organization, with no regard for the parents' beliefs or desires. "[T]he values of parental direction of the religious upbringing and education of their children in their early and formative years have a high place in our society," *Wisconsin v. Yoder*, 406 U.S. 205, 213-14, 217-18 (1972), and Lawrence was not entitled to exert his influence to persuade Cody to join in Lawrence's religious beliefs—those decisions were for Drew and Jimmy Treybig to make. Further, Lawrence coached Cody to hate and fear his parents, his brother, his friends, his teachers, and his city. Lawrence worked to convince Cody that his father was evil and a member of the Illuminati. He instructed Cody to lie to his parents, lie to a governmental entity (CPS), and steal money from his parents. Regardless of Lawrence's motives or sincerity, his conduct caused lasting, deep trauma on a child and chaos and discord within Cody's family. The jury did not have to consider the veracity of Lawrence's beliefs to conclude that his conduct was so extreme in degree and outrageous in character that it exceeded the bounds of decency. *See Twyman*, 855 S.W.2d at 621. The trial court did not err in refusing to exercise jurisdiction over Cody's suit. We overrule Lawrence's first issue on appeal.

In his second, third, and fourth issues, Lawrence attacks the jury's evaluation of the evidence and the weight it should have given to the testimony. He argues that the Treybigs contradicted each other and themselves and thus were not credible witnesses and that the jury erred in its verdict because the jurors did not understand Lawrence's view of religion. However,

appropriateness of its belief in 'laying hands' are at issue," and awarding damages for "religiously motivated emotional distress . . . would require us to take sides in what is essentially a religious controversy." *Id*. at 13.

14

Lawrence provides no authority to support his contentions and instead simply gives his own summary of the evidence. He further provides little in the way of record citations and sometimes makes factual assertions that are not taken from the trial evidence at all. He has thus not sufficiently briefed those issues. *See* Tex. R. App. P. 38.1(h); *Oxford v. Pinckney*, No. 03-13-00109-CV, 2014 WL 858863, at *2 (Tex. App.—Austin Feb. 25, 2014, no pet.) (mem. op.) (although we review pro se pleadings liberally and with patience, pro se litigants must comply with applicable laws and rules of procedure). Furthermore, even if we were to ignore the insufficient briefing on these issues, Lawrence is essentially attacking the jury's evaluation of witness credibility and demeanor, which are issues exclusively within the jurors' domain. Jurors "are the sole judges of the credibility of the witnesses and the weight to give their testimony" and may "believe one witness and disbelieve another," and we, as the reviewing court, cannot impose our opinions to the contrary. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). We overrule Lawrence's second, third, and fourth issues.

## CONCLUSION

Having overruled Lawrence's appellate issues, we affirm the trial court's judgment.

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Triana and Kelly

Affirmed

Filed: June 20, 2019

15