# Supreme Court of Texas

No. 22-0166

George Fleming and Fleming & Associates, L.L.P.,

*Petitioners,*

v.

Rebecca Wilson, et al.,

*Respondents*

On Petition for Review from the
Court of Appeals for the Fourteenth District of Texas

**Argued October 24, 2023**

JUSTICE YOUNG delivered the opinion of the Court.

Justice Devine and Justice Busby did not participate in the decision.

We last saw this case after the Fourteenth Court of Appeals had reversed the trial court's summary judgment on a technical ground. This Court reversed and remanded for the court of appeals to reach the merits. *Fleming v. Wilson*, 610 S.W.3d 18 (Tex. 2020). On remand, that court again reversed the summary-judgment order. 669 S.W.3d 450 (Tex. App.—Houston [14th Dist.] 2021). We granted the ensuing petition for review and now affirm, but for a reason different from the one stated by the court of appeals. Specifically, we conclude that petitioners are

judicially estopped from establishing an essential component of their summary-judgment motion.

## I

We begin with an abbreviated background. This case involves a long-running dispute between a lawyer and his former clients. Many years ago, George Fleming and his law firm—petitioners in this Court, to whom we refer jointly as "Fleming"—represented more than 8,000 plaintiffs in a mass-tort action against the manufacturer of a diet pill known as "fen-phen." Respondents are about 4,000 of Fleming's former clients, whom we call the "Wilson plaintiffs." Before suing the drug manufacturer in 2001, Fleming spent roughly $20 million to medically screen over 40,000 potential claimants. About 20% of them became Fleming's clients. In 2006, Fleming settled the case for $339 million.

Fleming reimbursed himself for the costs of the screenings by deducting that amount from the settlement funds. Based on the clients' contingency agreements with him, he then distributed their percentage of what remained. In other words, he charged his clients not just for *their own* medical-screening costs but also for those of approximately 32,000 people who never became his clients and who did not participate in the underlying case. *See Fleming*, 610 S.W.3d at 19.

This financial choice led to further litigation, now casting Fleming as the defendant in various actions brought by his former clients. In one, Sandra Karnes and Carol Tallant sued Fleming in federal court, claiming that Fleming breached his fiduciary duty to his clients by charging them for the screening costs. Karnes and Tallant tried to bring their lawsuit as a class action, but Fleming successfully opposed class certification,

convincing the court that certification would be "inappropriate" given how many distinct issues of law and fact separated the various potential plaintiffs. *Karnes v. Fleming*, No. H-07-0620, 2008 WL 4528223, at *8 (S.D. Tex. July 31, 2008) (order denying class certification). Federal jurisdiction over the state-law claims against Fleming was based on the Class Action Fairness Act, *see* 28 U.S.C. § 1332(d), so Fleming's success in defeating class certification also led the district court to grant Fleming's motion to dismiss the case for lack of jurisdiction.

After the class-certification denial in *Karnes*, another group of about 650 former clients—called the "Kinney plaintiffs"—sued Fleming for breaches of contract and fiduciary duty. In a bellwether trial involving ten of those plaintiffs, the jury rendered a verdict against Fleming. After the Kinney verdict, the Wilson plaintiffs—the roughly 4,000 respondents here—moved for summary judgment on the ground that the Kinney verdict collaterally estopped Fleming from contesting the merits of the Wilson plaintiffs' claims against him. Fleming successfully opposed that motion on the ground that "the [breach of fiduciary duty] issues presented by the *Kinney* Plaintiffs are nowhere near 'identical' to those of the *Wilson* Plaintiffs or any others." As support for his argument, Fleming noted that "the federal court [in *Karnes*] had denied class certification of breach of fiduciary duty claims precisely because Plaintiffs had failed to show that common questions predominated over the individualized issues." He then stated that "[n]othing has changed since *Karnes*." The trial court denied the Wilson plaintiffs' motion for summary judgment without explanation.

After several years had passed, Fleming moved for a trial setting in this case and proposed a bellwether trial with ten randomly selected

3

plaintiffs. In response, the Wilson plaintiffs proposed a bellwether trial with six plaintiffs randomly selected by the court: one from the largest group of settlements, two from the second largest group, and three from the smallest group. The court adopted the Wilson plaintiffs' proposal. Kathy Harpst was the first-named of these six, and for that reason the bellwether trial is called "the Harpst trial" and the six named plaintiffs are collectively called "the Harpst plaintiffs."

At the conclusion of the Harpst trial, the jury found in favor of Fleming. At that point, Fleming moved for summary judgment, asserting defensive collateral estoppel against the Wilson plaintiffs. Fleming, who in the past had successfully emphasized the many alleged differences among the various plaintiffs, now argued that the Harpst trial resolved the common issues against each of the approximately 4,000 remaining plaintiffs. The trial court granted summary judgment for Fleming.

The court of appeals initially reversed on the ground that the trial court's own judgment following the Harpst trial had not been "authenticated" in support of Fleming's summary-judgment motion and thus could not be the basis for a judgment against the Wilson plaintiffs. *Wilson v. Fleming*, 566 S.W.3d 410, 418 (Tex. App.—Houston [14th Dist.] 2018). We granted Fleming's petition for review and, in a per curiam opinion, reversed and remanded for the court of appeals to consider the merits of Fleming's collateral-estoppel defense. *Fleming*, 610 S.W.3d at 22.

On remand, the court of appeals again reversed. The court held that Fleming could not establish his entitlement to defensive collateral estoppel because there was no "privity" between the six Harpst plaintiffs and the larger group of Wilson plaintiffs. 669 S.W.3d at 463. Thus, the court

4

concluded, the claims of the thousands of Wilson plaintiffs other than the six Harpst trial plaintiffs could not be precluded by the Harpst judgment. Fleming again sought this Court's review, which we again granted.

**II**

We review a trial court's grant of summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). On a traditional motion for summary judgment, the movant—in this case, Fleming—must conclusively prove every essential element of his claim or defense as a matter of law. *Draughon v. Johnson*, 631 S.W.3d 81, 87–88 (Tex. 2021).

Fleming asserted three grounds for summary judgment in his motion: defensive collateral estoppel, waiver, and release. Fleming raised only collateral estoppel when he challenged the court of appeals' first judgment, so only that ground for summary judgment remains live. To assert collateral estoppel, the movant "must establish that (1) the facts sought to be litigated in the second action were fully and fairly litigated in the first action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action." *Sysco Food Servs., Inc. v. Trapnell*, 890 S.W.2d 796, 801 (Tex. 1994).

We confine our analysis to the first of these requirements, which we find dispositive. To benefit from defensive collateral estoppel, it is Fleming's burden to show that further proceedings would entail "the relitigation of *identical issues of facts or law* that were actually litigated and essential to the judgment in a prior suit." *Van Dyke v. Boswell, O'Toole, Davis & Pickering*, 697 S.W.2d 381, 384 (Tex. 1985) (emphasis added). Fleming sought to carry this burden by asserting in his summary-

5

judgment motion that "the facts and legal issues in *Wilson* are identical to *Harpst*." He noted that "[t]he *Wilson* Plaintiffs assert[ed] the same claims as the *Harpst* Plaintiffs" and that the claims all arose "from the same set of facts." He also argued that the "breach of contract claims . . . are governed by the same contractual terms" and that "the breach of fiduciary duty claim is governed by the same settlement agreements."

Fleming forcefully defends these arguments in this Court, asserting that we should adopt § 40 of the Restatement (Second) of Judgments, and especially comment b and illustration 3. He relies heavily on the U.S. Supreme Court's decision in *Taylor v. Sturgell*, 553 U.S. 880 (2008). These authorities, he argues, should persuade us that the Wilson plaintiffs impliedly agreed to be bound by the Harpst judgment, thus justifying application of nonparty preclusion and allowing us to reinstate the summary-judgment order favoring Fleming. In response, the Wilson plaintiffs point us to Fleming's repeated assertions that his prior clients' claims were insufficiently common for aggregate treatment. They explicitly identify Fleming's successful opposition to Karnes's motion for class certification as an example of his contradictory positions.

In a proper case, § 40 of the Restatement and *Taylor*'s approach to nonparty preclusion warrant this Court's serious consideration. But we conclude that we cannot consider them here, in the context of Fleming's motion for summary judgment, because of the doctrine of judicial estoppel.

## A

At its most general level, "[j]udicial estoppel is a common law doctrine that prevents a party from assuming inconsistent positions in litigation." *Perryman v. Spartan Tex. Six Cap. Partners, Ltd.*, 546 S.W.3d

6

110, 117 (Tex. 2018) (quoting *Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 385 (5th Cir. 2008)). "Its essential function is to prevent the use of intentional self-contradiction as a means of obtaining unfair advantage." *Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 6 (Tex. 2008) (internal quotation omitted). The primary goal of judicial estoppel is not to benefit the adverse party, although it will have that consequence. Judicial estoppel instead aims to protect the integrity of the judicial system itself. As the Supreme Court has put it, judicial-estoppel principles target circumstances where a "party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled.'" *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (quoting *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 599 (6th Cir. 1982)).

As with other forms of estoppel, therefore, the question is not whether a party's current position is correct but whether the party is entitled to press the position at all. And as with other equitable principles, judicial estoppel is subject to several important limitations. For one, "a party cannot be judicially estopped if it did not prevail in the prior action." *Ferguson v. Bldg. Materials Corp. of Am.*, 295 S.W.3d 642, 643 (Tex. 2009). A party has "prevailed" if it persuaded the court to adopt the party's position and thus grant the relief that the party sought. That party would "obtain an unfair advantage" if it could prevail in a second proceeding by directly contradicting its prior successful position. *Id.* The prior success is what makes it "unfair" for the party to obtain a new advantage by contradicting its initial position. So if the party "gained no

7

advantage" from its position in an initial proceeding, "[t]he doctrine of judicial estoppel simply does not apply" despite "the existence of an inconsistent position" in later litigation. *Id.* at 644.

Inconsistency alone, therefore, is not enough. A party who is unsuccessful in pressing a position does not threaten the integrity of the judicial process by changing course and later adopting the view of the prior court. Such "inconsistency" provides no unfair advantage. To the contrary, it would be unfair to hold a party to a position that was rejected in prior proceedings or to penalize a party for accepting a position that the prior court adopted.

Likewise, to satisfy the demands of judicial estoppel, the prior "statement must be deliberate, clear, and unequivocal." *Am. Sav. & Loan Ass'n of Hous. v. Musick*, 531 S.W.2d 581, 589 (Tex. 1975). After all, "[t]he doctrine is not intended to punish inadvertent omissions or inconsistencies but rather to prevent parties from playing fast and loose with the judicial system for their own benefit." *Ferguson*, 295 S.W.3d at 643.

Moreover, judicial estoppel applies only if the successful representation arose in a different case or, at most, "in another phase" of the same case. *New Hampshire*, 532 U.S. at 749 (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000)). The doctrine, we have said, precludes "a party who successfully maintains a position in one proceeding from afterwards adopting a clearly inconsistent position in *another* proceeding to obtain an unfair advantage." *Ferguson*, 295 S.W.3d at 643 (emphasis added). "[I]t is not necessary that the party invoking [the judicial-estoppel] doctrine should have been a party to the former proceeding." *Long v. Knox,* 291 S.W.2d 292, 295 (Tex. 1956). Nothing

8

turns on whether the adverse parties were different, as they typically are. By contrast, "[c]ontradictory positions taken in the *same* proceeding may raise issues of judicial admission but do *not* invoke the doctrine of judicial estoppel." *Schubert*, 264 S.W.3d at 6 (emphases added).*

We also emphasize that while the prior inconsistent statement must have been intentionally made, the doctrine does not require a court to conclude that a party aimed to purposefully deceive either the first or the second court. Purposeful deception, of course, would implicate even more serious concerns. We make no accusation of any such impropriety here. Judicial estoppel turns not on a party's subjective intent but on the objective inconsistency of that party's statements in different proceedings. In the face of such an inconsistency, the "perception" that the courts have been misled is at its height. *New Hampshire*, 532 U.S. at 750. The doctrine does not seek to police ill intent; it rather aims to protect the integrity of the judicial system as a whole. Judicial estoppel does not "punish" anyone for anything—it estops a party from

---

* Same-case inconsistencies are often wholly unproblematic. Parties may maintain alternative positions as a case unfolds. But some contradictions made earlier in the same proceeding may warrant relief when the contradiction prejudices the adverse party, who must demonstrate detrimental reliance on an earlier admission and "protect it by objecting to the introduction of evidence contrary to the admission and by objecting to the submission of any issue bearing on the fact or facts admitted." *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 765 (Tex. 1987). "[J]udicial oversight and procedural safeguards of a trial make it unlikely that inconsistent positions taken and resolved in the same proceeding will taint the judicial process." Mark J. Plumer, *Judicial Estoppel: The Refurbishing of a Judicial Shield*, 55 Geo. Wash. L. Rev. 409, 418 (1987). The doctrine of judicial estoppel is thus both inapplicable within and "unnecessary to protect the integrity of a single proceeding." *Id.* Those same-case safeguards, however, cannot prevent inconsistency *across* cases and in different tribunals. Judicial estoppel fills that void.

contradicting a prior position that falls within the doctrine's scope. It is neither a punishment nor unfair to hold a party to its prior position when the first court adopted that position and, because of that adoption, the party obtained the result it sought.

On the other hand, while judicial estoppel does not turn on a party's good faith, it is still "an equitable doctrine." *Perryman*, 546 S.W.3d at 117. Courts have discretion in applying judicial estoppel. *Id.*; *accord New Hampshire*, 532 U.S. at 750. A court may decline to apply the doctrine if, for example, it determines that a prior inconsistency was wholly inadvertent, played a comparatively small role in the earlier litigation, or provided a minimal or nominal benefit. *See Perryman*, 546 S.W.3d at 117; *Schubert*, 264 S.W.3d at 6. In such cases, the sense that the party is winning both coming and going—and, correspondingly, any hint of manipulation of the judicial system—is lessened or even eliminated. On the other hand, an indication of bad faith or an especially blatant inconsistency might warrant a court's exercise of its discretion to apply the doctrine even if the prior benefit was small, so long as the doctrine's requirements are otherwise satisfied.

But "[d]iscretion is not whim, and limiting discretion according to legal standards helps promote the basic principle of justice that like cases should be decided alike." *In re Rudolph Auto., LLC*, 674 S.W.3d 289, 308 (Tex. 2023) (quoting *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 139 (2005)). Consistent application of judicial estoppel follows from respect for the requirements and limitations we have described. Specifically, the party to be estopped must have obtained a benefit by making a clear and unambiguous statement that convinced a prior court to adopt a position

10

that contradicts the party's current position. The doctrine applies unless, under the circumstances, the court finds that its application would be unjust or contrary to the doctrine's underlying purposes.

**B**

The Wilson plaintiffs amply invoked the principles of judicial estoppel here. They highlighted at length Fleming's repeated assertions that his prior clients' claims were insufficiently common for aggregate treatment and, as an example of his contradictory claims, included explicit references to Fleming's opposition to Karnes's motion for class certification. The Wilson plaintiffs did not use the phrase "judicial estoppel," but they said more than enough to put Fleming on notice of their contention that his prior inconsistent statements should preclude relief for him here. We generally accord relief to litigants not on form, after all, but on substance, so long as the pleadings "provide[] the opposing party sufficient information to enable that party to prepare a defense or a response." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 225 (Tex. 2017).

We conclude that the doctrine applies. Fleming's assertions in prior litigation clearly and unequivocally contradict his summary-judgment motion's assertions regarding whether the Wilson plaintiffs' legal and factual positions are materially identical to those of the Harpst plaintiffs. In opposing class certification in *Karnes*, Fleming argued "that common questions would not predominate" because of "the substantial choice of law questions that need to be resolved" for each plaintiff. *Karnes*, 2008 WL 4528223, at *2. Supporting this argument, Fleming submitted an affidavit claiming that there were "significant differences in

11

the retainer contracts with respect to the charging of litigation expenses." *Id.* at *7. Fleming also argued that "the individualized contractual provisions for . . . the treatment of expenses" made class certification improper. *Id.* at *2. All of this reinforced his contention that class certification would be "inappropriate." *Id.* at *4.

The federal court was persuaded. *Id.* at *8. By successfully arguing that the legal and factual issues brought by his former clients were far from identical, Fleming obtained the result he desired: denial of class certification. Needless to say, avoiding a class action is a valuable result. *See, e.g.*, *Am. Campus Cmtys. v. Berry*, 667 S.W.3d 277, 286 (Tex. 2023) (acknowledging how significantly class certification "raises the stakes of a lawsuit"). Moreover, Fleming avoided not just the class action but the federal forum altogether. He obtained dismissal because, without a class action, there was no federal jurisdiction.

We do not doubt the good faith of Fleming's statements opposing class certification or his current contrary position. But the class-certification representations were clear and purposeful, unambiguous and specific. They were neither inadvertent nor misunderstood. The federal court relied on those representations to grant Fleming the relief that he sought—denial of class certification—which was far from nominal. Most importantly, the arguments on which the court relied to reject class certification directly conflict with Fleming's current position, which is that the Wilson and Harpst plaintiffs' factual and legal issues are materially identical.

This current position is essential for Fleming to prevail on his affirmative defense today. If the plaintiffs are not all situated identically,

12

both within the Wilson plaintiffs' group and relative to the Harpst plaintiffs, Fleming cannot show that the facts sought to be litigated by the Wilson plaintiffs were fully and fairly litigated in the Harpst trial. His summary-judgment motion depends on that foundation, and he has powerfully advocated the correctness of that position before this Court. Fleming argues, with significant force, that the Wilson plaintiffs *themselves* have repeatedly urged that their claims are sufficiently alike that a win for one could support offensive collateral estoppel for all. He contends that their hope of invoking offensive nonmutual collateral estoppel shows that they have impliedly agreed to be bound by the results of the trial no matter what they were. But even setting aside any distinction between offensive and defensive collateral estoppel, Fleming must carry his own summary-judgment burden to establish his affirmative defense. The doctrine of judicial estoppel forecloses his ability to do so because he is estopped from asserting that the thousands of remaining plaintiffs' claims are materially indistinguishable.

We therefore have no occasion to resolve the *correctness* of Fleming's current position—correct or not, he is estopped from asserting it. We thus reserve for future cases the extent to which, under Texas law, one may impliedly agree to be bound by a judgment to which one is not a party such that nonparty preclusion applies.

\* \* \*

The judgment of the court of appeals is affirmed.

Evan A. Young
Justice

**OPINION DELIVERED:** May 17, 2024

13